```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                           AUSTIN DIVISION

 3   SPIRIT AEROSYSTEMS, INC.,              ) AU:24-CV-00472-DII
                                            )
 4       Plaintiff,                         )
                                            )
 5   v.                                     ) AUSTIN, TEXAS
                                            )
 6   W. KENNETH PAXTON, JANE NELSON,        )
                                            )
 7       Defendants.                        ) OCTOBER 11, 2024

 8            **********************************************
                      TRANSCRIPT OF MOTIONS HEARING
 9               BEFORE THE HONORABLE MARK LANE
              **********************************************
10
     FOR THE PLAINTIFF:    DARREN L. MCCARTY
11                         MCCARTY LAW PLLC
                           1410B W 51ST STREET
12                         AUSTIN, TEXAS 78756

13                         MATTHEW T. MARTENS
                           GERARD A. SALVATORE
14                         WILMER CUTLER PICKERING HALE AND DORR LLP
                           2100 PENNSYLVANIA AVE, NW
15                         WASHINGTON, D.C. 20037

16   FOR THE DEFENDANTS:   RYAN SPENCER BAASCH
                           OFFICE OF THE ATTORNEY GENERAL OF TEXAS
17                         209 WEST 14TH STREET
                           AUSTIN, TEXAS 78711
18
                           MATTHEW THOMAS KENNEDY
19                         OFFICE OF THE ATTORNEY GENERAL
                           300 WEST 15TH STREET, 9TH FLOOR
20                         AUSTIN, TEXAS 78711

21   TRANSCRIBER:          ARLINDA RODRIGUEZ, CSR
                           501 WEST 5TH STREET, SUITE 4152
22                         AUSTIN, TEXAS 78701
                           (512) 391-8791
23

24   Proceedings recorded by electronic sound recording, transcript

25   produced by computer.
```

```
 1        (Proceedings began at 9:32 a.m.)
 2             THE CLERK:  The Court calls the following for a
 3   Motion Hearing:  1:24-CV-472, Spirit AeroSystems,
 4   Incorporated v. W. Kenneth Paxton and Jane Nelson.
 5             THE COURT:  Good morning, gentlemen.  Let's
 6   start with announcements.  Tell me who you are and who
 7   you represent.  We'll start over here on my left.
 8             MR. MARTENS:  Thank you, Your Honor.  Good
 9   morning.  My name is Matthew Martens, and I represent
10   Spirit AeroSystems, Inc.
11             MR. MCCARTY:  Darren McCarty.  I also represent
12   Spirit AeroSystems.
13             THE COURT:  All right.
14             MR. BAASCH:  Ryan Baasch on behalf of the
15   Office of the Attorney General and Jane Nelson.
16             MR. KENNEDY:  Matthew Kennedy for the Office of
17   the Attorney General and Jane Nelson.
18             THE COURT:  Welcome, gentlemen.  Messrs. Baasch
19   and Kennedy, Mr. Baasch I know you have something filed
20   authorizing you to be part of this case.  I assume
21   Judge Pitman is going to grant that, so I'm not that
22   concerned about that.  And then, Mr. Kennedy, as I
23   understand it from my courtroom deputy, you are licensed
24   but not yet -- we haven't formally entered you on the
25   case; is that right?
```

1          MR. KENNEDY:  That's correct, Your Honor.

2          THE COURT:  All right.  We'll get that done.

3          Okay.  Obviously, in preparation from the

4  hearing I've read what you-all have filed.  It's quite

5  thick, obviously, and it took a while.  I also want to

6  apologize to you.  I mean, this issue has been lingering

7  since July.  Oh, I could give you the reasons why, but

8  they're not really good other than just personnel changes

9  and other issues.  So I hope you'll forgive me for that.

10  But here we are, and now we will resolve the issue that

11  you two have joined.

12          Having read all the material, I'll share with

13  you, you can't read everything and remain a blank slate.

14  When you read everything, you start drawing some

15  conclusions and having some questions.  So, with your

16  indulgence, I'm definitely going to have you guys come up

17  and speak to your points, but don't be surprised if

18  during your discussion I interrupt you and ask you

19  questions.

20          One thing I kind of want to get clear before we

21  get started is -- and this questions is directed, I

22  guess, to the plaintiffs -- just to be clear, you are --

23  you are only moving forward on the facial

24  constitutionality of the statute or not -- not

25  as-applied?

1          MR. MARTENS:  We state both facial and

2  as-applied in our papers.  I think the analysis --

3          THE COURT:  You spend 99 percent of your

4  briefing on facial.

5          MR. MARTENS:  I think that the analysis ends up

6  becoming the same.  I think that they're trying to

7  defend, as we'll explain, by rewriting the statute by the

8  way they've crafted the May 13th request to examine.

9  But, ultimately, I don't think that you can change what

10  the statute says based on the RTE.  And so, ultimately,

11  we're challenging the statute.  That's what we've

12  challenged.  We've brought a challenge to the statute.

13  Obviously, they have applied it to us, or they're trying

14  to apply it to us through the RTE.  But you're right.

15  The focus of our challenge is the facial challenge.

16          THE COURT:  And I don't -- to be clear, it's

17  more than focus.  I mean, if this was an as-applied

18  challenge, I would have expected a lot more here about

19  the fact that you only have 90 employees in Dallas that

20  are related to Spirit and 20,000 somewhere else and

21  Spirit's incorporated out of Delaware.  And you make

22  those basic statements, but you don't make any arguments.

23          MR. MARTENS:  I don't think that those impact

24  the analysis, either facial or as-applied.  It's

25  as-applied to us in the sense that they have served an

1    RTE on us.  But I don't think that there's any other

2    facts that are relevant to the as-applied challenge.

3    Ultimately, I think --

4              THE COURT:  Well, I disagree.  I'm just telling

5    you --

6              MR. MARTENS:  Okay.

7              THE COURT:  -- just to be clear, any ruling I

8    make here is going to be on facial.

9              MR. MARTENS:  Okay.

10             THE COURT:  I just don't think you've made the

11   as-applied argument.  Now, having said that, depending on

12   what happens, I don't see what prevents you from making

13   the as-applied argument next.

14             But they are different.  And one of the reasons

15   I even raise it is because of all the cases I've read

16   about this, some courts don't even recognize the

17   distinction between the two analyses, and some do.  Most

18   seem to be as-applied.  Couldn't find much in the way of

19   facial constitutionality, particularly in the wake of

20   *Los Angeles v. Patel*.  So I'm just -- I'm cabining this

21   to facial.

22             MR. MARTENS:  And I'll keep my argument

23   accordingly.

24             THE COURT:  Okay.  Well, with that, you're our

25   plaintiff.  I think number-wise, the Attorney General's

 1  Office got in first with their cross-motion for summary

 2  judgment.  But I'll let you go first.

 3          MR. MARTENS:  Thank you, Your Honor.  May it

 4  please the Court?

 5          THE COURT:  Sure.

 6          MR. MARTENS:  Matthew Martens for Spirit

 7  AeroSystems.

 8          I think I should -- I'll start with what I

 9  think is undisputed here.  No one disputes that the

10  Fourth Amendment as interpreted in *Patel* requires an

11  opportunity for pre-compliance judicial review of an

12  inspection, of an administrative subpoena, of a request

13  to examine.  However, characterized, *Patel* requires the

14  opportunity for pre-compliance judicial review.

15          And I think no one also disputes the Texas

16  RTE statute, the request to examine statute, on its face

17  provides no mechanism for such review.  There's no --

18  unlike many of the other CID statutes, where similar

19  provisions with regard to other investigative authority

20  that the Attorney General has where there is specifically

21  identified a statutory basis to conduct a review -- to

22  conduct some judicial review, either through a motion to

23  enforce by the Attorney General or a motion to quash,

24  there is no such mechanism in RTE statute itself.

25          And, in fact, Texas law precludes that type of

1  review for two reasons:  First, Texas law, both the RTE

2  statute in its text and structure preclude review.  And,

3  secondly, the Texas state law of sovereign immunity

4  precludes such review.

5          So I'll discuss each of those in order.

6          So first with regard to the text and structure

7  of the RTE statute, the use of the word "immediate" in

8  defining the time for compliance precludes review as a

9  simple temporal matter.  The statute does not allow time

10  for review.  In fact, in the *Humble Oil* decision which we

11  place great reliance on, the court there explained what

12  "immediate" meant and how the statute actually operates.

13          What the court said in *Humble Oil*, is that the

14  statute, quote, requires every corporation to permit the

15  Attorney General or any of his assistants or

16  representatives to make examination of the record of --

17  records of the corporation as often as they may deem

18  necessary immediately after presentation of a request for

19  such examination.

20          So if the recipient of the letter is, by

21  statute, as interpreted in *Humble Oil* required to

22  immediately provide for inspection upon presentation of a

23  letter of request, then the statute necessarily doesn't

24  contemplate an opportunity for review.  Temporally, you

25  can't even obtain such review.

 1            And the Attorney General himself argued in the

 2    *Annunciation* case that "immediate" means what it says.

 3    In fact, he argued to that court that that word

 4    "immediate" should be interpreted, his words, quote, as

 5    written.  And he then cited dictionaries for the

 6    proposition that "immediate" means quote, right away, and

 7    further said that any delay in compliance is, quote, a

 8    matter of grace.

 9            So I would respectfully suggest that it would

10    be useful to hear whether the Attorney General stands by

11    the position, the interpretation of the statute that they

12    advanced in the *Annunciation House* case, where they said

13    "immediate" was clear, it means right away, it should be

14    interpreted as written.

15            And, in fact, in that case, when someone

16    attempted in a one-day grace period to bring a lawsuit,

17    the Attorney General deemed them out of compliance and,

18    as a result, sought to -- sought to file a *quo warranto*

19    proceeding.

20            So the Attorney General's position on the

21    meaning of the statute is exactly the position we've been

22    advocating, which is that the statute as written

23    precludes the idea of judicial review because of the

24    temporal requirement of immediate compliance.

25            But that's not the only reason I think that the

1    text and structure of the statute preclude judicial

2    review.  The Attorney General's unlimited discretion

3    under the RTE statute further confirms that there is no

4    judicial review contemplated under the statute.

5           Again, I go to the *Humble Oil* decision where it

6    says that the RTE statute, quote, grants to the Attorney

7    General the full and unlimited and unrestricted right to

8    examination of the corporation's books and records at any

9    time and as often as he may deem necessary.  The court

10   went on to say that it's a right of unlimited visitation

11   and seizure.

12          If it's unlimited and you have -- if it's an

13   unlimited right to inspect and you have to immediately

14   allow inspection, then the text and structure of the

15   statute necessarily preclude any opportunity for judicial

16   review.

17          And that's what *Patel* forbids.  That is in --

18   that is in no way distinguishable from the city ordinance

19   at issue in *Patel*, where the police could show up, demand

20   immediate access to the records, and the immediate -- and

21   if you didn't provide immediate access, you could be

22   arrested and charged with a misdemeanor.

23          Here you can be arrested, charged with a

24   misdemeanor, and lose your right to do business.

25          So on its face, the text and structure of the

1  RTE statute preclude any judicial review by the temporal

2  requirement of immediate access and by the lack of any

3  limitation or, as the *Humble -- Humble Oil* court put it,

4  the full and unlimited and unrestricted right to

5  examination.  You can't have an immediate access

6  requirement and an unlimited right to examination and

7  have, in that structure, judicial review.  So on its

8  face, the statute does not allow what *Patel* requires.

9          But, secondly, even if I'm wrong about that,

10  even if the statute didn't have an immediacy requirement

11  and didn't have unlimited right to inspection, under

12  Texas sovereign immunity law, a lawsuit to -- against the

13  Attorney General or against the Office of the Attorney

14  General to seek injunctive relief or other review of the

15  actual request is precluded.

16          You could under -- under 1983, and we have

17  here, brought an action to have the statute declared

18  unconstitutional.  And you can under Texas law,

19  notwithstanding the doctrine of sovereign immunity, bring

20  a lawsuit to have the statute declared unconstitutional.

21          What you can't do with the doctrine of

22  sovereign immunity is bring an action in state court for

23  a review of the reasonableness of the particular request

24  that you've received.

25          THE COURT:  Why not?

1            MR. MARTENS:  Because the doctrine of sovereign

2    immunity allows two types of lawsuit:  You can bring an

3    action against the Office of the Attorney General to have

4    the statute declared unconstitutional, but that doesn't

5    get you review of the particular request.  Or you can --

6    and so the -- the AG has said, well, you could bring an

7    *ultra vires* action against the Attorney General.  And

8    that's not true.

9            And the reason it's not true is because what

10   the court in an unfortunately named decision, also named

11   *Patel*, also from 2015, this one from the Texas Supreme

12   Court, explained the doctrine of sovereign immunity.  And

13   what they said is that, quote:  To fall within the

14   *ultra vires* exception, a suit must allege that a state

15   official acted without legal authority or failed to

16   perform a purely ministerial act rather than attack an

17   official's exercise of discretion.

18           So we can't bring -- we cannot fit within the

19   *ultra vires* action because the Texas Supreme Court's

20   decision in *Patel* says you could bring a lawsuit saying

21   the statute's unconstitutional, but we can't bring the

22   action we want to bring, which is to challenge his

23   exercise of discretion with regard to this particular

24   RTE, and to raise our objections to its scope, its

25   breadth, its burdensomeness, whether or not it seeks

1   documents outside the jurisdiction, whether or not it

2   seeks documents that are actually conceivably covered by

3   state law.  All the arguments you would normally make in

4   response to, for example, a civil investigative demand

5   and where you would -- when there's a civil investigative

6   demand, get an opportunity to litigate before a Texas

7   state court, we can't bring.  *Patel* is perfectly clear on

8   this.

9         And so that's the problem.  Under the doctrine

10  of state sovereign immunity, even if the statute didn't

11  preclude in its text and structure an action for -- for

12  the review, sovereign immunity precludes us from bringing

13  that type of case.

14        Now, the AG has identified a number of cases

15  that he thinks establish the right to bring an injunctive

16  action of that sort, where we would fight over the

17  particular exercise of discretion, to use *Patel*'s words.

18        So he cites the Supreme Court's -- the State's

19  Supreme Court's decision in *Zurawski*, just this year.

20  But that case actually supports the very point I'm

21  making, where in the -- the relevant excerpt it says that

22  you don't plead a valid declaratory judgment act claim

23  when -- when you -- I'm sorry.  You do -- you can bring a

24  valid claim when you challenge the validity of a statute,

25  but you can't have a valid claim where you challenge the

1   officer's actions taken in applying the statute.

2          That's the distinction the court drew.  You can

3   challenge the statute.  You can't challenge the exercise

4   of discretion under the statute.  So *Zurawski* says

5   exactly what *Patel* says.  It draws the same line.

6   *Ultra vires* is not for challenging the exercise of

7   discretion.  It's for challenging the statute.

8          So the AG I suspect will also cite a case

9   called *Chesterfield Finance*, a case from 1959 in the

10  Texas Court of Civil Appeals.  There's no discussion of

11  sovereign immunity in that case, and for good reason.

12  Because in that case the argument made is that, quote,

13  the AG was, quote, without authority, which is what is

14  permitted under the -- under the *ultra vires* exception.

15  Again, as *Patel* says, you can bring an *ultra vires* action

16  to say that the AG was, quote, without legal authority or

17  failed to perform a ministerial act, but you can't bring

18  one challenging his discretion.

19         In *Chesterfield*, though it doesn't discuss

20  sovereign immunity, it probably doesn't discuss it

21  because there the allegation was that the AG was, quote,

22  without authority.

23         The AG also relies on a case called *Alliborne*.

24  So there's two cases, actually, *Alliborne* and *Cotropia*

25  that the AG relies on, both unpublished decisions.

1  Neither of them establishes that our position is

2  incorrect with regard to sovereign immunity.

3          And the reason is because both *Alliborne* and

4  *Cotropia* were cases involving administrative subpoenas

5  issued by the Texas Medical Board.  And the relevant

6  provision of the Texas Medical Board statute actually

7  authorizes litigation over subpoenas.  Texas Occupational

8  Code, Section 153.007 authorizes there to be litigation

9  over subpoenas issued by the medical board and for that

10 litigation to be conducted by the AG.

11         And that's our point, is that if there's going

12 to be a waiver of sovereign immunity, it has to be by the

13 legislature.  That's what *Patel* says and that's what the

14 consistent case law from the Texas Supreme Court says, is

15 that the AG can't waive sovereign immunity, only the

16 legislature can waive sovereign immunity, and the

17 *ultra vires* exception is one to challenge legal

18 authority, not discretion.

19         So for all those reasons, both because of the

20 text and structure of the RTE statute and because of

21 doctrine of sovereign immunity, we lack the mechanism

22 that *Patel* says you have to be -- you have to have for an

23 inspection, a request, an administrative subpoena in

24 order for those to be compliant with the Fourth

25 Amendment.

```
1              THE COURT:  Let me elaborate briefly on where I

2   got started with whether this is a facial or an

3   as-applied challenge.  Again, with all due respect, you

4   mention "as-applied" once or twice, but it's really not

5   the focus of your briefing.  And I prepared for this as

6   though this was facial only.

7              The reason I say that is I would have thought I

8   would have seen much more with why -- like, for instance,

9   more about the fact that the AG's office is suddenly

10  interested in air transportation when, historically, the

11  State doesn't have any part to play in that.

12             Or the whole DEI request that the AG's Office

13  made, I would have thought that if this was an as-applied

14  challenge, I would have had a whole lot on that.  And

15  there really wasn't.

16             MR. MARTENS:  Well, the reason for that is

17  because those are the types of arguments we would make in

18  state court.  In other words, if we were in there

19  challenging the statute -- challenging, sorry, the

20  request to examine, we'd be arguing the AG doesn't have

21  any authority to investigate this, he doesn't have any

22  jurisdiction over air -- airplane construction, he

23  doesn't have any jurisdiction --

24             THE COURT:  Right.

25             MR. MARTENS:  But those are the arguments I
```

```
1   want to make in state court.

2          THE COURT:  I understand.  And those are

3   as-applied arguments.

4          MR. MARTENS:  No.  I think that those are

5   arguments about --

6          THE COURT:  Reasonableness.

7          MR. MARTENS:  -- about his authority to

8   investigate his state law investigative authority.  Those

9   are types of arguments I would be making in state court.

10  I'd be arguing that he's reaching outside the territorial

11  bounds of the State.  I'd be arguing about whether or not

12  he can investigate DEI.  I'd be arguing about whether --

13  but those are all arguments about the reach of his state

14  law authority.  I'm making -- I'm saying the statute has

15  a more fundamental problem, which is I can't even get

16  that review.

17         THE COURT:  I get that.  And so earlier you --

18  when we got started, you said facial and as-applied, and

19  I told you I thought you had just made facial arguments.

20         MR. MARTENS:  Right.  And that's why I'm trying

21  to focus my argument here, is the statute as written, on

22  its face, does not allow for the judicial review I'm

23  entitled to.

24         THE COURT:  Right.  I'm not criticizing you.

25  I'm just -- I want to make sure that no matter what I'm
```

1 writing or what I'm dealing with, I'm on the right

2 target.

3           So, really, you haven't made an as-applied

4 argument for the reasons you just stated.  You feel that

5 you can only make those in a state court action which

6 you're otherwise not authorized to ask -- or ask for,

7 given the RTE's language, right?

8           MR. MARTENS:  I think that those arguments are

9 not *Patel* arguments is what I would say.

10          THE COURT:  Okay.

11          MR. MARTENS:  And so what I have made is a

12 *Patel* argument, and I do think I've made it -- I

13 understand Your Honor disagrees.  I do think I made the

14 *Patel* argument as-applied.  I have not made other

15 arguments, as we've identified, the DEI issue or the

16 aircraft manufacture issue, because those are the type of

17 arguments that I would want to raise in a state court

18 proceeding where I would say the AG can't issue this

19 request because it's beyond his state law investigative

20 power.

21          THE COURT:  The reason I'm bringing all this up

22 is I'm wondering how much further I'm supposed to go past

23 just the review of the statute itself.  You know, I

24 understand this litigation is centered on what's

25 happening between the Attorney General's Office and

1  Spirit.  I get it.

2          MR. MARTENS:  Yep.

3          THE COURT:  But how much further afield do I go

4  in just reviewing the statute?  How much do I get into

5  the facts of the case?  For instance, I fully expect the

6  Attorney General's Office to say, oh, Your Honor we don't

7  have -- there's not a problem with the statute because we

8  provided 20 days' time, and we encouraged Spirit to seek

9  pre-compliance review.  So for those reasons the statute

10 remains viable.

11         How much do I get into that when I'm making a

12 legal analysis as to whether or not the statute itself is

13 constitutional?

14         MR. MARTENS:  We think that you analyze the

15 statute and only the statute.  The AG cannot, through a

16 RTE and throwing some language in there, rewrite the

17 statute.  As he said in *Annunciation House*, you

18 interpret the statute, quote, as written, not as the

19 Attorney General would like it to be written.  The

20 Attorney General tries to add all these new provisions

21 into his May 13th RTE to say, Well, we wouldn't object to

22 jurisdiction and we'll give you these number of days.

23 That's not what the statute says.

24         THE COURT:  All right.  Let me ask you this:

25 You articulated somewhere in the briefing, but what edits

```
1   have been made to the statute by the AG's Office in this
2   case?
3              MR. MARTENS:  So the AG can't edit the statute.
4              THE COURT:  I understand that.  But what have
5   they --
6              MR. MARTENS:  The AG has tried to.
7              THE COURT:  That's my question.
8              MR. MARTENS:  Yeah, yeah.  The AG has tried to
9   say, I think, two things:  One, that we will give you I
10  think it's 20 days to comply.  I don't remember if it's
11  10 or 20, but that's not the key point.  And then the
12  other thing is he has included language in the May 13th
13  RTE that says that they would not object to jurisdiction.
14             THE COURT:  What about the part of the RTE in
15  May that was served that said we won't object to
16  pre-compliance review?
17             MR. MARTENS:  So that's not exactly what they
18  said.
19             THE COURT:  Okay.  Well, tell me what they
20  said.
21             MR. MARTENS:  What they said is that they
22  wouldn't object to the jurisdiction of a state court if
23  we were to file an injunctive action.  And here's that --
24  here's the problem with that:  They can't waive sovereign
25  immunity.  The AG cannot waive sovereign immunity.  We
```

1   cite the cases in our brief that the only party that can

2   waive sovereign immunity is the legislature.

3          And so while the AG -- and sovereign immunity

4   is a jurisdictional issue under Texas state law, and

5   *Patel* explains that.  And so when they say we won't

6   object to jurisdiction, meaning we won't raise sovereign

7   immunity, that doesn't solve anything.  The court has an

8   independent obligation to evaluate whether it has

9   jurisdiction, and the AG can't waive that.

10          THE COURT:  Any other edits?  I mean, for

11  instance, the whole criminal penalty, haven't they

12  represented to you that they're not going to do that?

13          MR. MARTENS:  They -- they have explained that

14  they don't believe they have the authority to enforce

15  criminally.  Again, the question -- but they haven't

16  denied that there is statutory authorization for district

17  attorneys.  And it makes no difference to the *Patel*

18  analysis who can enforce criminally.

19          THE COURT:  I agree.

20          MR. MARTENS:  I mean, that was true in *Patel*

21  itself.  The police officer doing the inspection couldn't

22  do anything other than arrest.  He couldn't initiate

23  prosecution.  That had to be done by another office.  And

24  the court didn't find just the fact that the prosecution

25  authority versus the arrest authority was divided.

1  Similarly here, the AG staff can arrest, and a local

2  district attorney will make a decision whether to

3  prosecute.  Whether or not that person does prosecute,

4  again, is beside the point.  There was no evidence that

5  anybody had been prosecuted in *Patel.*

6          But you -- but what's not required is to force

7  a business person to stand there on the spot and say,

8  well, I'm going to try -- I'm going to resist on the

9  theory that maybe the DA won't prosecute me.

10          The fact is there's -- again, we're bringing a

11  facial challenge.  On its face the statute says that

12  we -- that the officials in my company, if they don't

13  comply, could be criminally prosecuted.

14          THE COURT:  Any other edits?

15          MR. MARTENS:  I don't believe that there are

16  any other provisions in the May 13th RTE that the

17  Attorney General has added to try to solve the statutory

18  problems.

19          THE COURT:  Okay.  Okay.  Thank you.

20          MR. MARTENS:  Thank you.

21          THE COURT:  All right.  Who is speaking for the

22  AG?

23          MR. BAASCH:  I am, Your Honor.  Thank you,

24  Your Honor.  We're here in an unusual posture today.

25  Spirit is complaining that it cannot obtain

1  pre-compliance review of a subpoena that was issued

2  nearly five months ago.

3          Yet here we are undergoing pre-compliance

4  review, where Spirit has not suffered and is at no risk

5  of suffering, a single penalty for noncompliance over the

6  last five months.

7          Whatever flaws you might think exist in the

8  statute, and I intend to address all of them today, it

9  should be clear that Spirit is in no position to raise

10  them.  The statute is not facially invalid.  It can be

11  constitutionally applied in at least some applications,

12  including this one.  And the court should not indulge

13  Spirit's invitation to apply the canon of constitutional

14  collision.

15          If Spirit's worst fears about the statute come

16  to light in a future setting, then that future

17  hypothetical subpoena recipient can raise an as-applied

18  challenge.  Spirit's pitch for the Court to construe the

19  statute in the most unconstitutional way imaginable and

20  then to declare it facially invalid does not pass muster.

21  And I respectfully submit, Your Honor, I've never seen a

22  party stretch and strain like Spirit has here to say that

23  it has no rights under state law when we insist that it

24  does.

25          I'm happy to proceed today however the Court

1  would find most beneficial, but my plan is to proceed as

2  follows, with the assistance of a slide deck I've

3  prepared for the Court's convenience.  With your

4  indulgence, I'll start that slide show now, and I can

5  hand Your Honor a paper copy of the deck as well, if you

6  would wish.

7          THE COURT:  Sure.  And I like making these a

8  part of the record.  Do you have an extra copy that I can

9  give the clerk?

10          MR. BAASCH:  I do, Your Honor.

11          THE COURT:  I'll give her mine after this.  Is

12  that your only copy?

13          MR. BAASCH:  Well, I'm going to point at the

14  screen, so I'm happy to give her mine.

15          THE COURT:  All right.

16          MR. BAASCH:  If this is working, that is.

17          THE COURT:  Sam, just mark that as

18  Defense Exhibit 1.

19          MR. BAASCH:  Well I apologize, Your Honor.

20  While my assistant helps me with the -- well, here we go.

21  Fantastic.

22          Okay.  As I was indicating before we got the

23  slide show up, I'd like to proceed as follows:  First I'd

24  like to talk a bit about *City of Los Angeles v. Patel*.

25  *That* case is the basket where Spirit places all of its

1   proverbial eggs, so I think it's important to explain the

2   reasons why that case came out the way it did.  Second,

3   I'll say a few words about the RTE statute.  Third the

4   facts about why this particular RTE was issued to Spirit.

5   I don't think, because they're not making an as-applied

6   challenge, given the way they've litigated this suit, I

7   don't think the facts of the underlying investigation

8   really matter much.  I don't think Your Honor needs to

9   burden yourself with understanding those facts to resolve

10  this motion.

11           THE COURT:  I agree.  But I'll share this with

12  you, and take this for what it's worth:  It seems like a

13  very aggressive use of the RTE statute by the Attorney

14  General's office to target an aircraft manufacturing

15  company that is, again, incorporated in another state,

16  primarily operates in another state, and has, I don't

17  know, one-one-hundredth or one-one-thousandth of its

18  employees are in Dallas, the rest are somewhere else, for

19  aircraft accidents and crashes that are the primary

20  jurisdiction of other entities.

21           It just -- because it's such an aggressive use

22  of the Attorney General's perceived powers under the RTE,

23  it invites stricter scrutiny by a court.  And that's one

24  of the reasons we're here, I think.  So I just wanted to

25  share that thought with you.

1          MR. BAASCH:  Certainly.  I understand that,

2    Your Honor.  And that's why I'll explain a little bit

3    about the investigation and why we do think it's within

4    the scope of our authority.

5          Fourth, I'd like to spend the bulk of my time

6    explaining the many options that Spirit has for

7    pre-compliance review and addressing some of the things

8    my friend on the other side said before me.  And then,

9    fifth, I'll address where all of their other arguments

10   fail.

11         So starting with *Patel*, I think the facts of

12   *Patel* are pretty straightforward.  There was a Los

13   Angeles municipal ordinance that required hotels to keep

14   certain records and to share those records with law

15   enforcement whenever law enforcement showed up and

16   demanded them.  The court held that the ordinance was

17   facially unconstitutional.

18         And I think there was three features of that

19   ordinance and the city's application of it that really

20   explain why that was.  The first critical feature was

21   that the ordinance allowed the City to conduct

22   on-the-spot arrests, and the court emphasized this in its

23   opinion.  I think that's extremely important because,

24   under the court's case law, the availability of

25   pre-compliance review is necessary before the subpoena

1  recipient before the other party suffers some kind of

2  penalty.

3            So in *City of Los Angeles v. Patel*, the penalty

4  is arrest on the spot if you resist.  You have no ability

5  to get pre-compliance review, because either you comply

6  on the spot or you're subject to arrest.  That's not the

7  case here, as I'll explain later.

8            The second critical feature of that case is

9  that the City said in its briefing that the ordinance had

10  to be enforced this way; that there could not be

11  pre-compliance review.  The City said it would be

12  worthless, it would be futile, to allow hotel operators

13  to have time, such as under an administrative subpoena,

14  to actually gather up the documents and submit them.

15            The City complains in its briefing to the

16  Supreme Court that, if they allowed hotel operators to do

17  that, the hotel operators might destroy the records,

18  might falsify them, et cetera, et cetera.  And so they --

19            THE COURT:  But isn't that the same argument

20  that one of your colleagues made out with -- in

21  *Annunciation House.*

22            MR. BAASCH:  Yes.  And I'm very familiar with

23  the *Annunciation House* case, Your Honor, and I'm very

24  happy to talk about it.  I can talk about it now.  I was

25  going to get to it on a future slide.

```
1              THE COURT:  No.  You keep going.  I just -- I
2    couldn't help it.
3              MR. BAASCH:  I will emphasize about
4    Annunciation House, and I'll say more about this later,
5    that an Annunciation House is an example where an
6    as-applied challenge might have more teeth.  Maybe the
7    statute is unconstitutional in certain applications.  I'm
8    certainly not saying that about Annunciation House.
9    There are special facts pertinent to the Annunciation
10   House case that made that case special.  But it's really
11   an as-applied challenge that hones on those particular
12   facts.  The facts here are nothing like that.
13             THE COURT:  Well, we will talk about that more.
14   I'm just sharing with you the AG's Office made the very
15   same argument as it relates to we have to get them right
16   away, otherwise, the receiving party might destroy the
17   evidence.  That's the same argument you made in
18   Annunciation House was made in Patel in the Los Angeles
19   case.
20             MR. BAASCH:  Certainly, Your Honor.  I think
21   that the core distinction that I just want to emphasize
22   here is that the City in Los Angeles v. Patel said they
23   needed the records on the spot every single time.
24             Annunciation House is just one example, the
25   only example in the last 100-plus years, where our office
```

1  has taken that position that any party to this litigation

2  can even identify.

3          The third point that I want to emphasize about

4  *City of Los Angeles v. Patel* is that the court took the

5  City at its word, emphasizing that the City did not even

6  attempt to argue that pre-compliance review could ever

7  occur.  And it's obvious from the City's briefs why the

8  court made that -- reached that conclusion.  The City

9  said it would never allow pre-compliance review.  I'm

10  going to argue the very opposite today.

11          So that's *City of Los Angeles v. Patel*.  The

12  second point that I want to discuss is the RTE statute

13  just very briefly.  I think we're all probably familiar

14  with the RTE here.

15          One point I'd emphasize in addition to just the

16  relevant textual provisions that I have on the screen is

17  that the statute is over 100 years old.  It's not

18  elegantly written.  It's not how a legislature would

19  write a statute like this today.  The statute was written

20  decades before some of the Supreme Court seminal case law

21  on administrative subpoenas, searches, and the like.  It

22  was written at the advent of the administrative state and

23  the federal government, much less the state government.

24  It's certainly not elegantly crafted.  And I think that

25  that's why there's some trickiness to understanding

1  exactly how it should apply in the 21st century.

2          None of that makes it unconstitutional.  So

3  four -- very briefly, four provisions that I think are

4  relevant here.  The first is that corporations shall

5  permit the Attorney General access to records.  The

6  second is that we must make a written request to the

7  corporation, and then the corporation shall immediately

8  give us the records.  The third is the potential

9  forfeiture of the right to do business in Texas if a

10  corporation fails to comply.  And the fourth provision is

11  the potential -- is the misdemeanor penalty.

12          So next I'd like to say a word about the

13  underlying investigation, particularly because Your Honor

14  asked about it.  I think it's public record at this point

15  that there have been very many highly public incidents

16  about defective parts on Boeing planes.  Spirit is a

17  parts supplier for Boeing, including for certain parts

18  that have been the subject of those public controversies.

19          So the vast majority of the things that we ask

20  about in the request to examine, the vast majority of the

21  records that we're seeking, are related to allegations

22  that were made in a class action complaint against

23  Spirit.  That class action complaint is very thorough.  I

24  don't think it's necessary for Your Honor to read it.

25  But if you do, it would -- I think it would underscore

1   why the State has so many concerns with Spirit.

2            And the class action complaint alleges in over

3   100 places -- I think that the word "misleading" occurs

4   over 100 times in this class action complaint, that

5   Spirit repeatedly misled investors and the public as to

6   certain flaws in its manufacturing process and in the

7   parts that it was supplying to Boeing.

8            Regardless of how many employees Spirit has in

9   Texas, that's a highly relevant set of facts for Texans,

10  because Texans fly on Boeing aircraft, obviously.  And so

11  Texans are indirect consumers of Spirit parts.

12  Regardless of whether Spirit had a facility in Dallas or

13  not, this is something the Attorney General's office

14  would be entitled to investigate and would have a very

15  strong interest.

16           THE COURT:  What do you mean, if they didn't

17  have it -- they have no presence here.  You wouldn't --

18  what did you mean by that?

19           MR. BAASCH:  So it's just like any -- any

20  corporation doing business -- doing business nationally.

21  It might be headquartered in a specific place, but

22  they're sending out goods and services that affects the

23  country nationally.

24           You can imagine a pharmaceutical company that's

25  headquartered in --

```
 1            THE COURT:  They do.  But they do it out of
 2   Kansas.  The outfit up in Dallas is just more repair and
 3   rehabilitation of parts.  I mean, I hear what you're
 4   saying, but this strikes me as an enormous reach to
 5   target these investigations, when none of the crashes
 6   happened in Texas.  The bolt didn't fall off in Texas.  I
 7   don't understand the DEI request, how they relate to this
 8   investigation.  This is your weakest argument.  I kind of
 9   want to stay focused on facial.
10            MR. BAASCH:  Certainly, Your Honor.  And I
11   would like to as well.  I'll move past the underlying
12   facts of the investigation, although I'm happy to answer
13   more questions about them if you wish.
14            THE COURT:  Well, I want to let you go forward
15   if you think the facts of the underlying investigation
16   have importance or relate to whether or not the statute
17   remains viable.  If you -- if those underlying facts you
18   believe they are, then I want to hear you.  But I
19   understand -- I don't have blinders on when I have a
20   facial analysis here.  But I -- the underlying facts I
21   don't think are as relevant.  And, if I'm wrong, somebody
22   needs to tell me.
23            MR. BAASCH:  Certainly, Your Honor.  I do not
24   think the facts are relevant to the facial challenge, and
25   that's because it's well established, under a facial
```

1    challenge, it's Spirit's burden to show the statute is

2    unconstitutional in every single application.

3              Now, an as-applied challenge might, as

4    Your Honor indicated earlier, those underlying facts

5    might be quite a bit more relevant if we were just

6    talking about this RTE.  But they're saying the entire

7    statute is unconstitutional.

8              THE COURT:  Right.  Right.

9              MR. BAASCH:  And I think, respectfully,

10   Your Honor, they have to make the facial argument.  They

11   really don't have an as-applied argument because the

12   *Patel* argument doesn't work as-applied.  We gave them 20

13   days.  So this whole argument about immediacy, they've

14   got no options, it just doesn't work.

15             THE COURT:  You gave them 20 days, but by what

16   authority did you have the right to give them 20 days?

17   By what authority do you have the right to give them 10

18   days or 30 days?  In other words, it's clearly a

19   discretionary act on the part of the Attorney General

20   that's not written into the statute at all.

21             MR. BAASCH:  I'm happy Your Honor asked that

22   question.  That was going to be one of the places I go to

23   next.  The statute authorizes the Attorney General to

24   seek immediate access.  That's -- that's basically the

25   fact pattern of *Annunciation House*.  We thought that that

1   authority was -- it was necessary to use that authority

2   in its strongest form in *Annunciation House* because of

3   facts specific to that case.  But the statute doesn't

4   insist that we must demand records immediately.  I don't

5   think it would make any sense if it did.  We're the ones

6   that has to send the written notice to the corporation

7   saying we want records in the first place.  Naturally, we

8   can decide when that written request is going to be

9   submitted, and I think it's natural to infer that we can

10  decide when the records must be produced.

11          THE COURT:  But you've used words like

12  "natural" and "infer" not in the statute.  Why aren't

13  they in the statute?

14          MR. BAASCH:  I think that goes back to my point

15  about when the statute was written, Your Honor.  It's

16  over 100 years old.  No legislature would write the

17  statute exactly the same way today.  There are many

18  administrative subpoena statutes in the Texas Code that

19  are written differently and that I think account for

20  developments that occurred in the 20th century.  These

21  statutes are just written in a more elegant way today.

22          But, as we pointed out in our briefs, it's

23  common for courts to look at subpoena statutes like this

24  that don't have a time for compliance and to read in a

25  reasonable time to comply qualifier.  We cited an opinion

1  from Judge Jordan to that point.  I think it's the *ESI* --

2  forgive me, Your Honor.  I don't have the name of the

3  case memorized -- case.  And Judge Jordan in that case

4  cited to a number of other federal cases.  There's a

5  Fourth Circuit case about grand jury subpoenas,

6  explaining how courts will read in a reasonable time

7  qualify if there is no set time frame for compliance.

8         And I think, Your Honor, all we ask is that the

9  same apply here.  There's no reason why the same analysis

10  shouldn't apply here.  If Your Honor were, by contrast,

11  to take Spirit's invitation and to read "immediate" to

12  mean it has to be on the spot, it can never be later --

13         THE COURT:  I know.  But that's exactly what

14  you -- maybe it was you, but one of your colleagues

15  argued in *Annunciation House*.  Immediate means immediate.

16         MR. BAASCH:  And the only point I think that's

17  relevant here from that posture, or I think the reason

18  why *Annunciation House* is highly distinguishable, I

19  should say, is that we took the position there that we

20  had authority to seek it on the spot.  The reason why we

21  took to that position in *Annunciation House* is because

22  there were strong indications that *Annunciation House* was

23  engaged in criminal conduct and would destroy documents.

24  And so our position is, hey, this statute that we usually

25  use to allow 20 days for --

```
1              THE COURT:  Can I ask you, did the DA -- was
2    this El Paso County?
3              MR. BAASCH:  It was.
4              THE COURT:  Did he invite the AG's Office in to
5    conduct this criminal investigation?
6              MR. BAASCH:  I'm not sure I'm able to make --
7              THE COURT:  I don't think he did.  So by what
8    authority did the Attorney General's Office have to
9    investigate a crime that occurred in El Paso?
10             MR. BAASCH:  Certainly, Your Honor.  So the
11   Attorney Generals Office is always able to investigate
12   corporations chartered in Texas for compliance with their
13   governing documents or for compliance with all of the
14   laws of the State of Texas.  That's in the Business
15   Organizations Code 12.153.
16             THE COURT:  I know.  But -- but you're -- so
17   you're telling me, then, that they're allowed to conduct
18   criminal investigations under that rubric, right?
19             MR. BAASCH:  Allowed to investigate crimes and
20   then impose civil penalties.
21             THE COURT:  Okay.  But then on the flip side,
22   you're telling me the Class B misdemeanor that's
23   authorized in the RTE statute, the Attorney General's
24   Office doesn't have the independent right to pursue that
25   criminally.
```

```
 1            MR. BAASCH:  That's absolutely right,
 2    Your Honor.
 3            THE COURT:  That just seems a little
 4    180 degrees to me.
 5            MR. BAASCH:  Well, the state of the Texas high
 6    courts case law on this might not be the most intuitive,
 7    but the Texas High Criminal Court has concluded we cannot
 8    prosecute, full stop, period, without a district
 9    attorney.
10            By contrast, we can investigate crimes and then
11    impose a civil penalty, such as forfeiture of the
12    corporate charter.  That's what's at issue in
13    Annunciation House.  The crimes are the predicate for the
14    penalty of corporate charter forfeiture.
15            THE COURT:  And isn't that also here with the
16    quo warranto proceedings that are authorized if you want
17    to, to go against Spirit?
18            MR. BAASCH:  If they -- if they refused to
19    comply, that be an authorized penalty.  That's right,
20    Your Honor.
21            THE COURT:  As it relates to the Class B
22    misdemeanor, could not the AG's Office just marry up with
23    a DA, pick a DA.  I don't know how many we have.  We
24    have, what, 254 counties.  We have fewer DAs.  But
25    couldn't the AG's Office just marry up with the
```

1  cooperating DA and then pursue charges, if it wanted to.

2         MR. BAASCH:  Potentially, Your Honor.  We're

3  not hiding from that fact here.

4         THE COURT:  Okay.  So the AG's Office may not

5  have statutory authority to move forward criminally, but

6  they do have the ability to do so under certain

7  circumstances.

8         MR. BAASCH:  Well, I think I would caveat that,

9  Your Honor, by saying we need -- we would need a district

10 attorney to ever initiate a criminal action under the

11 current state of --

12        THE COURT:  I know.  But the current world

13 we're living in, you can find a DA that will help you

14 with that.

15        MR. BAASCH:  Sure, Your Honor.  We're not

16 saying that it's impossible that a misdemeanor -- that

17 the misdemeanor provision could ever be enforced.  But

18 they're making a facial challenge.  They have to show

19 it's unconstitutional in every application, and they

20 can't point to a single application where a district

21 attorney has ever enforced that misdemeanor provision.

22 And certainly we have no ability to do it on our own.

23        THE COURT:  What does that have to do with the

24 facial analysis, that it's never been challenged before?

25 I mean, clearly, we wouldn't be talking if we were in the

1    1940s, for instance.  Here we are where we are.  We're

2    talking in the wake of *Los Angeles v. Patel* and some of

3    the other more recent cases that kind of changed the

4    analysis and changed the -- and hardened the review of a

5    100-year-old statute.  At least that's my opinion on the

6    subject.

7            I'm sorry.  I told you that I'd interrupt you,

8    but I don't want to do so.  I want you to -- I want you

9    to continue with your arguments.

10           MR. BAASCH:  Certainly, Your Honor.  Well, I

11   want this to be most useful for the Court, so I'm happy

12   to take your questions instead of going through my

13   presentation.

14           THE COURT:  Well, I keep -- I keep getting you

15   off your game.  I don't mean to do that.  I want you

16   to -- I'm not going to interrupt you again.  Go ahead.

17           MR. BAASCH:  Thank you, Your Honor.  I think

18   this slide is actually the most critical one in the whole

19   slide deck.

20           Spirit has many options for pre-compliance

21   review.  The first one I want to go over is an

22   *ultra vires* claim seeking injunctive relief.  My friend

23   on the other side made some representations about the

24   availability or not of an *ultra vires* claim that are

25   simply not true, they do not accurately convey what the

1 Supreme Court of Texas decided just last term in *State v.*

2 *Zurawski*.

3          So in *State v. Zurawski*, the Supreme Court

4 concluded that a declaratory judgment action was

5 available to challenge the constitutionality of the

6 statute at issue there.  The Supreme Court of Texas also

7 said -- and I have the footnote on-screen here -- that a

8 plaintiff who alleges a state actor is improperly

9 applying the law through an enforcement action may bring

10 an *ultra vires* claim against that official.

11          That's exactly what we have said that Spirit

12 can do here.  A declaratory judgment action according to

13 *State v. Zurawski* might not be available but an

14 *ultra vires* claim absolutely is.

15          THE COURT:  So break that down for me.  You're

16 saying that Spirit would have the right to file an action

17 against the AG's Office.  And what would their claim be?

18          MR. BAASCH:  It would be an *ultra vires* claim

19 seeking injunctive relief.  And we -- there's an example

20 on the next slide where a party did this under the RTE

21 statute, did this exact thing.  Granted, it was many

22 decades ago, but I don't think the Court should strain to

23 conclude that pre-compliance review is not available

24 when, by all indications, it is.

25          THE COURT:  No.  All right.  I'm going to

1  apologize again.  I've lied to you too many times.  I'm

2  probably going to keep interrupting.  So I want to break

3  down the *ultra vires*.  As I understand the way that

4  works, they would file an action saying the AG doesn't

5  have the authority to do this, and then we would look at

6  the RTE statute and we'd go it appears -- and trust me on

7  this, I'm not quibbling with the fact that attorney

8  generals across to United States have the right to seek

9  information from corporations that are operating in their

10 state.  That's not what we're talking about.

11         So they would file the action saying the

12 Attorney General is out of line here, Judge.  They're

13 operating outside the rubric of the RTE statute.  But if

14 you look at the RTE statute, that wouldn't be the case.

15 I think you'd say, No, the AG is operating under the

16 authority given to it under the RTE statute.  That's

17 where it ends.  There's not a reasonableness inquiry into

18 what the Attorney General's Office actually asked for.

19         MR. BAASCH:  I could tell you exactly how they

20 would make their argument in state court.  I'll almost

21 write the petition for them from the podium here.

22         The *ultra vires* claim is available if we are --

23 if the Attorney General is not complying with the statute

24 or with the Constitution.  The way that they can make a

25 reasonableness argument is to say that the Fourth

1    Amendment requires the Attorney General to act reasonably

2    when he issues administrative subpoenas.  We don't

3    believe this administrative subpoena was reasonable

4    because of reasons X, Y, and Z, and we're saying it's not

5    in compliance with the Fourth Amendment for that reason.

6            Reasonableness review is a Fourth Amendment

7    doctrine, and the *ultra vires* claim is available for

8    constitutional claims.

9            THE COURT:  But the RTE statute that gives the

10   AG's Office the authority to seek this information

11   doesn't say anything about reasonableness.

12           MR. BAASCH:  That's right, Your Honor.  And I

13   go back to the fact that it's over a 100-year-old

14   statute, but the statute must be interpreted against the

15   backdrop of the Constitution.  The Texas Supreme Court

16   has said that repeatedly, that you should not read the

17   statute to just carve out the Fourth Amendment and say it

18   doesn't exist in this world.  No.  The Fourth Amendment

19   should be incorporated into how you interpret the

20   statute, the Fourth Amendment commands reasonableness

21   review, and so they could go to a Texas State Court

22   tomorrow and they could say we want our reasonableness

23   review.  Because if this isn't reasonable, then the Texas

24   Attorney General has violated the Fourth Amendment.  They

25   can do that.  It's our position that they can do that,

1 and I think the case law reflects they can do that.

2          *Zurawski* says that basically explicitly here.

3          If you'd go back -- forward one slide, Matt.

4 Thank you.

5          And then this is an example -- this

6 *Chesterfield* case is an example of an RTE recipient, so

7 it's this exact context, bringing an action for an

8 injunction pre-compliance.  So here you see it.  A Texas

9 Intermediate Appeals Court, I think one that this Court

10 should defer to or maybe must defer to under *Erie*,

11 entertaining an action for an injunction.

12          My friend's only response to this case was to

13 say, well, that case didn't actually address sovereign

14 immunity.  And, granted, that's technically true.  But I

15 don't think we should just presume that the availability

16 for review that this court found would not be available

17 in a subsequent case.

18          I mean, maybe the Texas Supreme Court would say

19 that.  I don't think they would, but we shouldn't presume

20 it, especially when the State Intermediate Court of

21 Appeals has entertained the exact -- almost the exact

22 suit that Spirit wants to bring here.

23          So that's the *ultra vires* claim for injunctive

24 relief, but there's other options, too.

25          The second option would be subpoena recipients

as a general matter under Texas state law can achieve

pre-compliance review through an action for protective

order under the State's generally applicable rules of

civil procedure.  The *Alliborne* case recognized this.

This was a subpoena recipient that filed a

petition for a protective order.  My friend from the

other side indicated, well, that's only because in that

specific case the medical board's governing statute, the

occupation code, allowed for that remedy.  And so I guess

Spirit is saying it wouldn't be available here, but it is

available here.

The recipient in that case sought a protective

order under generally applicable rules of civil

procedure, Rule 176.6 and 192.6.  Spirit can take

advantage of the same generally applicable rules of the

civil procedure to get up -- to seek a protective order.

And this is another Texas Intermediate State Court of

Appeals opinion recognizing that this form of review is

available, and I don't understand how Spirit could come

here and insist that that just shouldn't be followed.

You see it again in another -- from another

court that this one -- that this Court is bound by, the

Fifth Circuit.  I recognize it's an unpublished opinion,

but the Fifth Circuit here recognizing that a protective

order is available in Texas State Court.

1          A subpoena recipient can move for a protective

2  order in Texas State Court.  The Fifth Circuit did not

3  say there that's only available for Texas Medical Board

4  subpoenas.  No.  It's generally available.

5          THE COURT:  But is what you've given to Spirit

6  probably characterized as a subpoena?

7          MR. BAASCH:  I think it is, Your Honor.  And

8  the reason why it is -- and our opening brief has some

9  case law on the difference between a search and a

10  subpoena.  A search implies that some entry has occurred

11  and that something has been taken.  A subpoena is just a

12  document, like a grand jury subpoena, requesting

13  information.  And that's exactly what the request to

14  examine --

15          THE COURT:  Just curious.  I don't recall.

16  What was your demand styled as?

17          MR. BAASCH:  It's styled as a request to

18  examine.

19          THE COURT:  Okay.

20          MR. BAASCH:  The -- I recognize that the

21  language of the letter is a little wonky or the styling

22  is a little wonky.  We're just borrowing that from the

23  statute.  But the substance of the letter, the first page

24  of the letter, says:  Produce these records within 20

25  days.  And it tells Spirit who to send the records to.

1  It tells them they could send them digitally.  It's

2  absolutely a subpoena, Your Honor.  It doesn't

3  contemplate a search.  It doesn't contemplate entry.

4  There's no example in the RTE statute's enforcement

5  history ever of physical entry occurring or a physical

6  search occurring.

7           So that's their protective order option.

8           And then they have a third option.  I think

9  candidly I'll recognize this is the weakest option.

10  Maybe in light of *Zurawski* maybe it's no longer on the

11  table.  But the *Humble Oil* case said that an action for a

12  declaratory judgment is available.

13           *Zurawski* didn't overrule *Humble Oil*.  *Humble*

14  *Oil* is directly on point.  I would submit that, until the

15  Texas Supreme Court says otherwise, *Humble Oil* provides

16  that a declaratory judgment action is available.

17           But, of course, you don't need to there,

18  because the *ultra vires* claim and the option for

19  protective order are both clearly available under

20  recent -- very recent Texas Supreme Court, Texas Court of

21  Appeals, and Fifth Circuit precedent.

22           THE COURT:  And that's where I'm confused by

23  what a facial analysis of the statute is as opposed to

24  what the AG's Office and what has been adopted over

25  100 years.  And that is it seems to be what's happened

1  is, clearly, the statute itself is -- is not

2  appropriately written in today's day and time.  It's not.

3          But it's being "Frankenstein-ed" and held

4  together through representations by folks like you from

5  the AG's Office that we don't do that.  We provide the

6  20-day grace period most of the time.  We'll give

7  extensions.  We're very reasonable people.  And we

8  encourage -- we now put the language in our request to

9  examine than you can seek pre-compliance.  But all of

10 that is not in the statute itself.

11         And whether it's this AG or the next AG, can't

12 the next AG just say, no, we're not -- we're not going to

13 provide the 20 days.  We're just going to move forward.

14 And I know what your answer would be:  Well, Judge, that

15 would be the perfect vehicle, then, by which to look at

16 whether or not the statute -- but it goes back to a

17 facial analysis as opposed to an as-applied analysis.

18         I thought I was supposed to just look at how

19 this statute is worded and whether it authorizes what the

20 Attorney General's Office is seeking.

21         MR. BAASCH:  Certainly, Your Honor.  I've got

22 two responses there.  The first response is that the

23 facial challenge burden for them is to show that it's

24 unconstitutional in every application.  I think what

25 Your Honor is asking is, Well, how far can I look to see

1   what the possible range of applications are?

2          I don't think you just need to stick to the

3   strict terms of the statute for a number of reasons.  One

4   is that Texas courts are supposed to strain to read

5   statutes in a constitutional way, not in an

6   unconstitutional way.  So I think you indulge every

7   presumption that the statute can be interpreted

8   constitutionally.

9          Two, I think you look at the backdrop of case

10  law that exists in Texas showing, both in the RTE context

11  and in other highly related contexts, that pre-compliance

12  review is available.  That's not written into the

13  statute; I recognize that, Your Honor.  But it is written

14  into the Texas State Code and the protective order

15  provisions.  It is recognized by the Texas Supreme Court.

16  I don't think you can just ignore all that.

17          THE COURT:  I don't think I can either, but

18  you-all make the argument I shouldn't even look at

19  *Annunciation House*.  It's hard for me to do, because the

20  AG's Office speaks with one voice, not two mouths.  And,

21  recently, colleagues of yours in El Paso have said, Well,

22  yeah, that may be good in most cases.  But in this one

23  we're moving forward without pre-compliance review.

24  We're not -- we're not suggesting for a moment that

25  *Annunciation House* has the right to pre-compliance

1  review.  That's what troubles me here, is the enormous

2  amount of discretion that's been given to the AG's

3  Office.

4          MR. BAASCH:  Well, two points about

5  *Annunciation House*, Your Honor.  The first point is that

6  I don't think Your Honor needs to ignore that case.  In

7  fact, I think that case is quite fatal for Spirit.  It

8  shows that an as-applied challenge can be made and

9  perhaps made successful if the facts are right.

10         So if the future Attorney General that you're

11 hypothesizing says, No, no, no.  Immediate.  You must

12 give it to us right now.  We're going to show up at your

13 door and we're going to demand the records right now.

14 Well, you've got an as-applied challenge to the statute

15 there.  That's what *Annunciation House* did.  Maybe that

16 will be successful.

17         We take the position that *Annunciation House*

18 was wrongly decided -- it's on appeal to the Supreme

19 Court of Texas -- because there were exigent

20 circumstances in that case that necessitated the

21 immediate access.  But that's a one-off.  That's an

22 as-applied challenge.  Those are very unique facts.  The

23 only reason we demanded immediate access was because of

24 those unique facts.  And the only reason we think it

25 could be constitutionally applied in that setting is

1   because of those unique facts.

2        By contrast, in the mine-run of cases, we don't

3   demand immediate compliance, and we don't think it can be

4   constitutionally demanded either.  If there is no

5   exigency, we don't think we can just say give us the

6   documents right now for no pre-compliance review.  And

7   that's why with Spirit, 20 days -- actually, it's been

8   five months, really.  No compliance by them and no

9   penalties either.

10        THE COURT:  But do they sleep well at night

11   knowing that the next day you could file that action?  I

12   mean, that's part of the problem here, is the chilling

13   aspect of the what the Attorney General's Office could

14   do.  You keep telling me, Oh, but we're benign.  We don't

15   do that.  We're nice.  But how does the other side know

16   when the hammer may drop?

17        MR. BAASCH:  So Spirit knows the hammer won't

18   drop before the time to comply lapses.  And right now,

19   pursuant to a stipulation, they have until at least

20   November 4th.  We can't do anything before then because

21   they're not in noncompliance before November 4th.

22        But I would also like to talk for just a

23   second, Your Honor, about what would happen if we were in

24   that noncompliance world.  Nobody from Spirit is getting

25   arrested or prosecuted.  What would happen -- and this

1  happened in *Annunciation House* -- is that we might, if we

2  decide it's warranted, petition for what's called a

3  *quo warranto* action to revoke their corporate charter in

4  Texas.

5          And in that context they can get all the review

6  they want.  They can say as a defense to the *quo*

7  *warranto*, Well, hey, this RTE was invalid, it was

8  unreasonable, et cetera, et cetera.  They're still going

9  to get pre-compliance --

10          THE COURT:  That's not pre-compliance review.

11  That's pre-sanctions review and post-review.  That's your

12  weakest argument.  So ...

13          MR. BAASCH:  Sure, Your Honor.  I don't want to

14  get hung up on that point here, because that's obviously

15  not where we are.  But, if I may, I would just like to

16  very briefly address a few other points by Spirit.

17          So the first point, and we talked about this a

18  bit, is that the statutory command of immediate

19  compliance implies a reasonable time frame.  There's

20  ample case law supporting that proposition, including

21  Judge Jordan's opinion and the many cases that he cited

22  there.

23          The second thing I want to emphasize -- I think

24  we've talked a little bit about this -- no possibility of

25  physical entry.  Never has occurred.  None of the parties

1    in this litigation have ever identified it occurring.

2           The third point I want to emphasize -- this is

3    again from the *Zurawski* opinion -- is that the Supreme

4    Court has recognized that action -- this is analogous,

5    not directly these circumstances, Your Honor.  But it is

6    recognized that parties don't even have standing to

7    enjoin the Attorney General from moving forward with

8    criminal sanctions because the Attorney General has no

9    authority to proceed with criminal sanctions.

10           I think this goes to your point about district

11    attorneys.  Yes, it's possible.  It's highly speculative

12    that we could partner up with a district attorney and

13    prosecute that misdemeanor.  But the Supreme Court -- the

14    Supreme Court of Texas knows that, but it has

15    nevertheless recognized that parties generally don't even

16    have standing to complain about the Attorney General

17    initiating criminal enforcement.

18           I think that goes to the fact that this is a

19    facial challenge.  They've got to show it's

20    unconstitutional in every application, not just that,

21    hypothetically, one day maybe we'd partner up with a

22    district attorney.

23           The final point is *Annunciation House*.

24    *Annunciation House* we think was wrongly decided.  It's on

25    appeal.  But the most critical point I want to emphasize

about *Annunciation House* is that the court there actually
allowed us to issue more administrative subpoenas under
the statute.  And the court simply said, I, the court, am
going to conduct pre-compliance review of those
subpoenas.

    We've got no objection to a court here
conducting pre-compliance review of Spirit's subpoena.
That's why we've extended the deadline by five months.
Even *Annunciation House*, by far their best case, does not
go as far as they need it to go.

    And with that, Your Honor, I -- that's the end
of my presentation.

    THE COURT:  Can I ask you -- and this is pure
ignorance -- were there other means by which you could
have gotten information from Spirit?  In other words, I
don't want to dive into the as-applied analysis.  But the
AG's Office chose the RTE vehicle by which to acquire
this but make the argument in briefing that we're trying
to advance an interest to protect the people of Texas for
the Texas Deceptive Trade Practices Act or the business
code.  Why didn't you lay down an administrative subpoena
under those provisions to get the information?  Was there
a tactics reasons?

    MR. BAASCH:  Certainly, Your Honor.  There is a
number of statutes that -- more modern statutes that

1  authorize administrative subpoenas.  But they're all

2  different.  They don't necessarily provide the scope that

3  the RTE statute provides.  And Your Honor raised the

4  Deceptive Trade Practices Act statute.  That -- to issue

5  a subpoena under that statute, we have to be seeking

6  evidence of misleading or deceptive practices.  And our

7  experience, and I think what Spirit would likely argue

8  here, is, well, a lot of what you're seeking couldn't

9  plausibly be related to misleading or deceptive

10 practices.  Therefore, we're not going to give it to you.

11 And you've got to have that whole fight of whether it

12 comes within the scope of that relatively narrow grant

13 for an administrative subpoena.

14         But the business organization code with the

15 request to examine statute, we can seek records more

16 generally.

17         THE COURT:  Okay.  Okay.  Thank you.

18         MR. BAASCH:  Thank you, Your Honor.

19         MR. MARTENS:  Briefly, Your Honor?

20         THE COURT:  Yeah.  You guys take your time.

21         MR. MARTENS:  Well, thank you for that.

22         THE COURT:  I'm not in a hurry.

23         MR. MARTENS:  I appreciate that.

24         Your Honor, so I'd like to cover a couple of

25 points here.  And, first, my colleague made great -- made

1  a big deal about the arrest on the spot language in

2  *Patel*.  The AG can arrest -- criminally arrest on the

3  spot for failure -- for the misdemeanor violation of

4  failure to comply with an RTE.  We cite that in our

5  summary judgment opposition brief.  Texas criminal

6  Procedure, Section 2.122 defines a peace officer as

7  investigators commissioned by the Attorney General.  And

8  Section 14.01(b) says a peace officer may arrest an

9  offender without a warrant for any offense committed in

10 his presence or within his view.

11           THE COURT:  Right.  And I agree.  They can make

12 the arrest; they can't make the prosecution.

13           MR. MARTENS:  Right.  And they couldn't in

14 *Patel*.  The same thing.  The police officers in *Patel*

15 couldn't make the prosecution.  They had to go to another

16 authority to prosecute.

17           THE COURT:  But Mr. Baasch would say that's not

18 what's happening here.  We're not making that threat.  We

19 didn't do that in *Annunciation House*.  We haven't done

20 it.  We've got an investigator who provided an affidavit

21 who said he's not aware of it ever been done.  Does that

22 change --

23           MR. MARTENS:  *Patel* was a pre-compliance

24 review, and no one was prosecuted there.  And the court

25 found the statute facially unconstitutional.  Why?

1    Because the -- what the court said is that you decide

2    facial constitutionality based on what the statute says,

3    not what the AG doesn't do.

4            In other words, what they're in here arguing is

5    saying:  Don't worry about the statute.  We're not going

6    to enforce it.  And so that's an example of when it won't

7    be unconstitutionally applied.  Respectfully, that's

8    nonsense.  You can't say, if I don't apply the statute,

9    there's an example of it not being applied

10   unconstitutionally.

11           And that's not just my view.  That's the

12   Supreme Court's view in *Patel* where they said on page --

13   on page 419, quote:  But when assessing whether a statute

14   meets the standard, meaning the standard for a facial

15   challenge, the court has considered only applications of

16   the statute in what it actually authorizes or prohibits

17   conduct.

18           In other words, you don't look at what they

19   won't do if they don't apply the statute.  You look at

20   what the statute authorizes them to do, and you say:  Is

21   that constitutional?  Because for good reason.  We don't

22   leave citizens to sit there and decide on the spot, Will

23   the AG exercise his discretion not to enforce the statute

24   or won't he?  Because faced with that, any sane citizen

25   would say I'm not taking that risk.  I'm going to comply.

1  I'm not going to rely on the good graces, or as the AG

2  put it, "a matter of grace" from the Attorney General.

3         And so that's the problem.  It's not that the

4  AG can say I won't enforce it.  The facial problem is

5  that he can enforce it.  And as written, or to use

6  *Patel*'s words, when you look at, quote, what it actually

7  authorizes or prohibits, when you look at that, that's

8  the problem.  What it actually authorizes is criminal

9  prosecution.  And any -- any and every application of

10 that, that possibility being out there, that threat being

11 out there, is exactly what renders the statute

12 unconstitutional, because every single citizen who

13 receives an RTE is faced with that threat and the choice

14 of whether to comply or not comply.

15        The AG might say I won't do it.  That's not

16 binding.  You couldn't bring a lawsuit later and say,

17 Well, you said you weren't going to do it.

18        THE COURT:  Is it cured by the fact that

19 they -- the Attorney General's Office has not done that

20 and has acknowledged the need for pre-compliance review

21 and encouraged you to do that?  Does that cure the

22 problems with the statute.

23        MR. MARTENS:  I just come back to *Patel*.  The

24 court considers only applications of the statute in which

25 it actually authorizes or prohibits conduct.  The only

1  thing that you consider, because the only thing the *Patel*

2  court considered, is what the statute authorizes.

3       And to -- but even if you want to look at that

4  conduct, it doesn't save the statute.  The fact that they

5  have not prosecuted it in any situation previously in no

6  way binds them to say they can't prosecute in the future.

7  And so to take the Spirit folks or anyone else at

8  Annunciation House or otherwise who receives an RTE, are

9  they to defy the statute and defy the request and say,

10 well, you know, I'll take my chances.  It's never been

11 prosecuted in the past.

12      *Patel* says no.  *Patel* says, in evaluating a

13 facial challenge, you look at what the statute

14 authorizes, because the Fourth Amendment is meant to

15 protect us against the whims of the government.  We're

16 not meant to be left there wondering, Will he exercise

17 his discretion or won't he?

18      In fact, the whole purpose of *Patel* is to put a

19 judge between that, to put a judge between citizens and

20 the exercise of the AG's discretion.  The whole point of

21 *Patel* is to make sure people aren't left to that

22 discretion.  That's what the court says in *Camara*, which

23 is quoted in *Patel* -- the court in *Camara v. City and*

24 *County of San Francisco*.  The court said you cannot,

25 quote, leave the occupant subject to the discretion of

1  the official in the field, end quote.  Why?  Because,

2  quote, that's precisely the discretion to invade private

3  property, which we have consistently circumscribed by a

4  requirement that a disinterested party warrant the need

5  for the search.

6          THE COURT:  And which case is that?

7          MR. MARTENS:  That's *Camara v. Municipal Court*

8  *of City and County of San Francisco*, 387 U.S. 523 at

9  pages 532 and -33.  We cite it in our case in our briefs,

10 and the court in *Patel* cites it for that very proposition

11 that they're here saying, Don't worry, our discretion.

12 And as -- as American citizens, we're not subject to

13 their discretion -- the Executive Branch's discretion.

14 We're entitled to, under the Fourth Amendment, a judge to

15 stand between us and the investigators.  That's been the

16 consistent point of the Fourth Amendment throughout its

17 history.  It was reaffirmed in that case I just cited,

18 *Camara*; it was reaffirmed in *Patel*.

19          And so their whole argument, which is "don't

20 worry, sometimes we don't apply it unconstitutionally,"

21 doesn't save the statute.  The question is, Does the

22 statute authorize unconstitutional conduct?  Yes.  And

23 their exercise of discretion not to use the statute is

24 exactly what *Camara* says doesn't save the statute.

25          And so that's the biggest problem with their

1 argument, is they're here saying, in essence, trust us.

2 And that's great if you're not on the potential criminal

3 prosecution end.  But that's not enough.

4          Second point:  The AG has yet to cite a single

5 case in which any court has said that sovereign immunity

6 allows a challenge to an RTE.  No court has ever said

7 that.  They have never cited one.

8          And I want to go back and address the language

9 in the slide deck that was used.  I don't know if my

10 colleague would be so kind as to put the *Zurawski* -- and

11 I know I caught you off-guard there.

12          THE COURT:  That's all right.  I have it here.

13          MR. MARTENS:  Your Honor has it.  So it's

14 page 9 on the slide deck.

15          THE COURT:  I'm good.

16          MR. MARTENS:  *Zurawski*.

17          THE COURT:  Yes.

18          MR. MARTENS:  So they -- they quote the

19 parenthetical here from the *Sefzik* case, and here's what

20 it says:  An applicant challenging an agency's denial of

21 a permit did not plead a valid declaratory judgment act

22 claim.  Why was it not valid?  Because the applicant

23 didn't challenge the validity of the statute but instead

24 challenged the validity of the officer's action taken in

25 applying the statute.

1       That's exactly what the *Patel* 2015 Texas

2   Supreme Court said.  You could have a valid declaratory

3   judgment action if you challenge the validity of the

4   statute.  But they said that's not what that defendant

5   did or that party did in his declaratory judgment action.

6   So it doesn't work.  They said, in fact what he did is he

7   challenged the validity of an officer's actions taken in

8   applying the statute.  That you can't do.

9       And so there's nothing inconsistent between

10  *Zurawski* and *Patel*.  I could challenge the statute, but

11  what I can't do is go in and raise all of these concerns

12  that Your Honor sees.  Your Honor said this seems like an

13  overreach.  This seems like it's being "Frankenstein-ed,"

14  you know, all of those arguments.  Is DEI within the AG's

15  jurisdiction?  Can he investigate out-of-state parts

16  manufacturers?  Those are all state law questions that I

17  would like to raise.

18      And to your last question, had they served me

19  with a CID under the consumer fraud statute, you know

20  what that statute allows me to do: file an action to

21  challenge.  It's statutorily authorized that I can file

22  an action to raise those challenges.  And what happens

23  when I file that action: automatically stays the CID

24  until the court decides it.

25      So you want to know why they didn't use that

1  option when they claim they could: because they're trying

2  to deny me that right.  They're trying to deny me that

3  option.  They've had -- they talk about five months.

4  They've had five months to switch stream.  And, instead,

5  they haven't because they don't want me making all the

6  arguments that Your Honor is making about this statute

7  being -- being an overreach and "Frankenstein-ed" is

8  exactly what'd want to be arguing in front of a Texas

9  State Court here in Travis County or in Dallas County.

10         But I'm denied that opportunity because they've

11  gamed the system with a statute that unconstitutionally

12  strips me of that ability.  And they've yet to cite a

13  single statute -- a single case that says sovereign

14  immunity doesn't bar me.

15         And I'll also note they're not even actually

16  claiming that the text and structure of the RTE statute

17  allows it.  In fact, what you heard Mr. Baasch argue was

18  you should rewrite the statute.  He said you should read

19  into it.  I wrote it down.  He said you should read into

20  the statute a reasonableness requirement.

21         And I just want to point out that that's not

22  what he told the *Annunciation House* court or his

23  colleagues told the *Annunciation House* court.  They

24  didn't say read into the statute a reasonableness

25  requirement.  They said that it's a matter of grace to

1 extend any time, and a matter of grace by the Attorney

2 General.

3          They said that the statute has to be -- that

4 they have to get at -- that the statute authorizes access

5 right away.  They said, quote, the common, ordinary

6 meaning of "immediately" is that OAG must be given access

7 to the records right away.

8          They went on to say -- they said they

9 contrasted another statute that allows for

10 interrogatories to corporations on page 11.  But they

11 said, under that statute, someone has 31 days to respond.

12 Then they said, quote:  That is obviously a sharp

13 contrast from the instruction to permit, quote, immediate

14 access to the Attorney General.

15          The word -- keep going on.  The word

16 "immediate" meant -- excuse me.  The Legislature's use of

17 disparate timing language within the code confirms that

18 when it used the word "immediate," it meant what it said.

19 They continue:  The court must enforce the statute as

20 written.

21          So they as you said, they're talking out of two

22 sides of their mouths, leaving me again subject to

23 discretion and every other citizen of Texas subject to

24 discretion.  One minute they say it has to be enforced as

25 written when it's to their strategic advantage to do so.

1  And then they come into this court and say it doesn't

2  actually mean that.  It means "within a reasonable time."

3          And so I want to know, have they corrected

4  their misrepresentation to the Texas -- to the court in

5  El Paso?  Because while they're telling you it means

6  within a reasonable time, they're telling that court it

7  means as written, with no time whatsoever.  They can't

8  both be true, and yet they've represented both of those

9  things to this court -- to two courts, leaving Texas

10  citizens who receive RTE like -- or recipients like

11  Spirit left to guess will it be enforced right away or

12  won't it be enforced right away, and who is going to be

13  subject to criminal prosecution?  And that's not what's

14  allowed under *Camara*.  We aren't subject to those whims.

15  We aren't subject to that discretion.

16          One last point.  Mr. Baasch said repeatedly

17  that this -- that this is pre-compliance review.  It

18  absolutely is not.  I can't come to this -- I can't file

19  an action in federal court and make state -- purely state

20  law objections to the scope of the Attorney General's

21  jurisdiction.  And, again, not just my view that this

22  isn't pre-compliance review.  A court considered that

23  argument.

24          We cite the case *Airbnb, Inc. v. City of*

25  *New York*, a 2019 case applying *Patel*.  And on page 494,

1 there the City of New York made the argument, well, you

2 brought a 1983 action.  You got your pre-compliance

3 review.  And the court was, like, no.  The court said:

4 The City has alternatively argued that if pre-compliance

5 review is required, the court's evaluation of the

6 ordinance in this litigation would qualify.

7          So they brought a facial challenge, and the

8 City said, well, you brought a facial challenge to the

9 statute, so you got your pre-compliance review.  The

10 court said, continued, but any such review by the court

11 could assess only whether the ordinance on its face was

12 reasonable under the Fourth Amendment.  The court's

13 facial assessment in this litigation would not give a

14 particular booking service a forum to challenge any

15 particular application of the ordinance.

16          And so the court rejected that argument, that

17 the -- that the 1983 action is pre-compliance review.

18          This is not pre-compliance review.  This is not

19 an opportunity to raise state law objections to the scope

20 of the particular request.  That's what I would have if a

21 CID was served, that's what we're constitutionally

22 entitled to under *Patel*, and that's what we have not had

23 even five months later.  Thank you.

24          THE COURT:  Thank you, Mr. Martens.

25          MR. BAASCH:  Thank you, Your Honor.  I'll keep

1   it very brief.  There's only three points that I'd like

2   to address about what my friend on the other side just

3   said.

4           First the point about whether we've made a

5   misrepresentation to El Paso in the *Annunciation House*

6   case.  This is very important.  There is, first and

7   foremost, an irony to my friend saying that, Oh, no, you

8   have to look only at the statute.  Don't look at other

9   case law.  Don't look at the Attorney General's

10   enforcement history, et cetera, et cetera.  But then he

11   wants you to look at *Annunciation House*.  You hear it all

12   throughout his briefs; you've heard it all today.  I

13   don't think you can square that circle.

14           THE COURT:  Can I interrupt you there?

15           MR. BAASCH:  Certainly.

16           THE COURT:  If I take -- I'm taking you at your

17   word.  So if I -- for purposes of analyzing the RTE

18   statute I ignore *Annunciation House*, isn't it equally

19   fair for me to ignore AG representations that they

20   provide grace and encourage parties to seek

21   pre-compliance review in state court?

22           Aren't those -- both of those issues outside

23   the analysis of the statute as written and whether or not

24   it is facially constitutional?

25           MR. BAASCH:  I think that that's technically

1    true, Your Honor.  And the reason I say "technically" is

2    because I think there's an important nuance to that.

3            Those examples illustrate ways that that the

4    statute could be implied, some constitutional, maybe

5    some -- I don't know what Your Honor's view is on

6    *Annunciation House* -- maybe some unconstitutional.  It's

7    examples that they could be applied in those different

8    ways, and Your Honor has to ask as part of the facial

9    analysis:  Is it unconstitutional in every application?

10           We've shown you many that I think are clearly

11   constitutional.  They like to harp on *Annunciation House*.

12   That's not enough for a facial challenge.

13           As far as whether we made a misrepresentation

14   to El Paso, no.  The point in that litigation was that

15   the statute authorized us -- it does not require, but it

16   authorized us to go as far as we did.  In order to comply

17   with the Fourth Amendment, there would have to be an

18   exigency.  We recognize that.  The question, really, for

19   the *Annunciation House* setting is was there an exigency.

20   That's highly fact sensitive.  It's susceptible to an

21   as-applied challenge.  It doesn't move the ball here for

22   them.

23           I think, in recognition of that, my friend on

24   the other side pivoted to this point about, well, the

25   statute just gives them too much discretion, and that's

1  the problem.  We've kind of moved on from pre-compliance

2  review, and now we're just in a world of they can't have

3  this much discretion.

4          But discretion cashes out in an as-applied

5  challenge.  If we exercise the discretion in an

6  unconstitutional way, you've got an as-applied challenge.

7  You've got maybe a party like *Annunciation House* saying

8  there was no exigency.  As-applied challenge.  This can't

9  be done to us.  That doesn't work for Spirit.

10          The last -- the thing I'd like to close with,

11  though, Your Honor, is I'd like to explain what I think

12  that they can do.  They can go to state court tomorrow.

13  They could seek a protective order.  They could bring an

14  *ultra vires* claim.  We would not object to the court's

15  jurisdiction.  We're not raising sovereign immunity.

16          If the court *sua sponte* raises jurisdiction on

17  its own, Spirit can respond, Well, Your Honor, to the

18  state court, if you conclude that you don't have an

19  ability to review this RTE, then the RTE is

20  unconstitutional under *Patel*.  It's one or the other.

21  Either the state court can review it.  That's our

22  position.  Or if the state court says it can't, you're

23  right in the *Patel* problem.  And I think that'd be a win

24  for them if -- if they're right.  If they're not right,

25  they can go to state court tomorrow.  The state court

1    will hear this suit.  The state court will be bound by

2    the authorities that we showed you, providing that

3    pre-compliance review is available.

4              Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Baasch.  Give me

6    just a minute.

7              Okay.  First of all, let me tell you the

8    briefing in this case was excellent.  You guys probably

9    didn't write it.  Probably smart people back at your

10   respective outfits did.  So kudos to them.  I thought

11   they did a great job.

12             You two men did an equally good job here today.

13   Best part of the job is being in the courtroom and

14   hearing good arguments by lawyers who know how to

15   advocate.  So well done.

16             But as in many cases or almost all cases, I can

17   sometimes cut the baby in half.  This isn't one of them.

18   This is one where I'm being called upon to make a ball or

19   a strike call, and so somebody is going to walk away here

20   today not as pleased.

21             I think one of my favorite parts of the

22   briefing is actually in a reply brief that was prepared

23   by the plaintiff.  It's Document 25, page 1.  In an

24   effort to avoid that conclusion, the Attorney General

25   responds that sometimes he does not apply the RTE statute

1   as written, instead affording request recipients more

2   time to comply as a matter of grace.  But the Founders

3   enacted the Fourth Amendment precisely so that the People

4   did not need to rely on the grace of executive officials

5   to protect their liberties.

6           This grace is accordingly irrelevant to the

7   facial challenge to the statute.  As the Supreme Court

8   explained in *Patel*, when addressing a facial challenge to

9   a statute authorizing warrantless searches, the proper

10  focus of the constitutional inquiry is searches that the

11  law actually authorizes, not those for which it is

12  irrelevant.

13          I don't know whether it's just me or my

14  background as a prosecutor, but I'm a literal guy.  I am

15  black and white, sometimes to the dismay of others.  But

16  when I look at this, it just strikes me this call for me

17  is easy.  The cases that precede *Patel*, they're -- I'm

18  not throwing them all out by any means, but they're not

19  as important to me on the question I'm supposed to answer

20  today that are shaped by the *Patel* case that came out in

21  2015.  It's kind of what's happened, *Patel* speaks for

22  itself in the few cases that we have since then.  And it

23  just strikes me that, whether by hook or by crook, this

24  is simply a facial challenge.  It's not an as-applied

25  challenge.

1          I tend to agree with Mr. Martens.  I'm -- he

2  couldn't file a reasonableness action in federal court,

3  and I really don't want do to it, or an as-applied

4  challenge here either.  So he's here on a facial

5  challenge.

6          And in doing that, unless I'm wrong, and I

7  could be wrong, it's about the statute as written.  And,

8  I mean, the AG's Office has to concede the statute is

9  silent as to pre-compliance review.  It's silent as to

10  the grace or discretion extended to the Attorney General.

11  It's all been made up.  It's bootstrapped.

12          And, you know, I commend the effort.  It's an

13  old statute, and efforts are being made to keep it alive.

14  But in the wake of *Patel*, pre-compliance review is simply

15  not there.  And the only reason *Annunciation House* is

16  important is it serves as a current and recent example of

17  not just any attorney general, but this Attorney General,

18  taking a completely different position on whether or not

19  the party is entitled to pre-compliance review or not.

20          Now, whether there are exigent circumstances,

21  I'll concede that that's a fact-based issue for that

22  case.  But it just strikes me that the language in

23  support of the Attorney General's actions in *Annunciation*

24  *House* is a perfect example of why this statute is flawed,

25  it's age, and its lack of addressing the current state of

1    the law is fatal.

2         I'm not sure exactly what form or shape my

3    final order is going to take.  But, Mr. Martens, I'm

4    going to charge you with preparing a proposed order for

5    my signature.

6         As all the lawyers do, you-all normally file

7    proposed orders that are short and sweet.  I don't need

8    that.  I need something more robust.  I need something

9    that clearly explains that the statute's failure to

10   provide for pre-compliance review is fatal; that the

11   bootstrapping efforts of the Attorney General's Office

12   keep it alive are inadequate; that the proposed

13   pre-compliance review alternatives that are not written

14   into the statute are not practically effective for the

15   reasons you have articulated both here today, but also in

16   your briefing and, obviously, distinguished Mr. Baasch's

17   best arguments, which I think center on *Zurawski* and some

18   of those other cases that he cited.

19        I'll get that, I'll wire-brush it, and then

20   I'll issue that.  But, again, I go back to where I just

21   started a moment ago.  This to me wasn't that hard.  I'm

22   looking at the statute the way it was written.  In the

23   wake of *Patel*, it is no longer valid as far as I'm

24   concerned.

25        Yes, sir?

1            MR. MARTENS:  Is there a time by which you'd

2    like us to submit that?

3            THE COURT:  The sooner the better, but how much

4    time do you need?

5            MR. MARTENS:  Ten days?

6            THE COURT:  Yeah.  That's fine.  So what does

7    that make it?

8            MR. MARTENS:  Today's the 11th.  So the 21st, a

9    week from Monday.

10            THE COURT:  All right.  That -- by the close of

11    the 21st and the morning of the 22nd.  All right.

12            MR. MARTENS:  Thank you.

13            THE COURT:  All right.  Again, gentlemen, good

14    job.  Thank you.

15        (Proceedings concluded at 10:58 a.m.)

16

17

18

19

20

21

22

23

24

25

**REPORTER'S CERTIFICATE**

1

2     I, Arlinda Rodriguez, do hereby certify that the foregoing

3 was transcribed from an electronic recording made at the time

4 of the aforesaid proceedings and is a correct transcript, to

5 the best of my ability, made from the proceedings in the

6 above-entitled matter, and that the transcript fees and format

7 comply with those prescribed by the Court and Judicial

8 Conference of the United States.

9

10 /S/ Arlinda Rodriguez                October 16, 2024

11 ARLINDA RODRIGUEZ                     DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25