**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| Jolt Initiative, Inc., | |
|          Plaintiff, | |
|    v. | |
| Kex Paxton, in his official capacity as Attorney General of Texas | Case No.  1:24-cv-01089-DII |
|          Defendant. | |

**BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER IN SUPPORT OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

AMICUS CURIAE'S IDENTITY & INTERESTS ........................................................................ 1

INTRODUCTION ..................................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

I.   The Legislative History Supports Protections for Voter Assistance from Intimidation under Section 11(b) as Pled by Plaintiff. ................................................................................ 3

II.  The Text of Section 11(b) Contemplates the Type of Intimidation Alleged by Plaintiff. ........ 7

III. The Common Understanding of Intimidation Includes the Conduct Alleged by Plaintiff. .... 11

CONCLUSION ....................................................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**                                                                         **Pages**

*Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021)..........10

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020)...........................................................8

*Damon v. Hukowicz*, 964 F. Supp. 2d 120 (D. Mass. 2013)..........................................................9

*Freeman & Bass, P.A. v. State of N.J. Commission of Investigation*, 359 F. Supp. 1053
    (D.N.J. 1973).......................................................................................................................12, 13

*Fund Texas Choice v. Deski*, No. 1:22-CV-859-RP, 2024 WL 3223685
    (W.D. Tex. May 1, 2024).....................................................................................................12, 13

*Halprin v. Prairie Single Family Homes of Dearborn Park Association*, 388 F.3d 327
    (7th Cir. 2004).........................................................................................................................10

*Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486
    (N.D. Cal. Sept. 3, 2024) .........................................................................................................8

*League of United Latin American Citizens - Richmond Region Council 4614 v. Public Interest
    Legal Foundation* (*LULAC v. PILF*), No. 1:18-CV-00423, 2018 WL 3848404
    (E.D. Va. Aug. 13, 2018) .........................................................................................................8

*Leocal v. Ashcroft*, 543 U.S. 1 (2004)........................................................................................7

*National Association for Advancement of Colored People v. Alabama ex rel. Flowers*,
    377 U.S. 288 (1964)..................................................................................................................14

*National Association for Advancement of Colored People v. State of Ala. ex rel. Patterson*,
    357 U.S. 449 (1958).............................................................................................................11, 13

*National Association for Advancement of Colored People v. Thompson*,
    357 F.2d 831 (5th Cir. 1966) ....................................................................................................14

*National Coalition on Black Civic Participation v. Wohl*,
    661 F. Supp. 3d 78 (S.D.N.Y. 2023) .......................................................................................10

*National Coalition on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) .....................................................................................10

*Pennington v. Donovan*, 574 F. Supp. 708 (S.D. Tex. 1983) ...............................................12, 13

*People v. Horelick*, 424 F.2d 697 (2d Cir. 1970)..........................................................................9

*People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725 (E.D. Va. 1992)............................10

*Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*, No. 97-cv-0040 (RLE), 1999 WL 893398 (S.D.N.Y. Oct. 18, 1999) ...........................................................................9

*The Ku Klux Cases*, 110 U.S. 651 (1884) .....................................................................................2

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961) ....................................................................8

*United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965)....................................................................9

*United States v. Harvey*, 250 F. Supp. 219 (E.D. La. 1966) .........................................................7

*United States v. Lauderdale County, Mississippi*, 914 F.3d 960 (5th Cir. 2019) ...........................7

*United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) .........................................................12, 14

*United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012)............................................................13

*Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968).......................................................10, 14

## Statutes

42 U.S.C. § 1985(2) .........................................................................................................................9

42 U.S.C. § 3617 .............................................................................................................................9

52 U.S.C. § 10101(b) ......................................................................................................................8

52 U.S.C. § 10307 ..................................................................................................................7, 8, 14

52 U.S.C. § 10307(b) ......................................................................................................................3

## Other Authorities

*Alabama civil rights activist Maggie Bozeman dies*, Tuscaloosa News (Aug. 29, 2004), https://www.tuscaloosanews.com/story/news/2004/08/29/alabama-civil-rights-activist-maggie-bozeman-dies/27873342007/. .........................................................................................6

Ari Berman, *Give Us The Ballot* (2015) ....................................................................................5, 6

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. REV. L. & SOC. CHANGE 173 (2015) ...................................................................2

*Extension of the Voting Rights Act: Hearings Before the H. Subcomm. on Civil and Constitutional Rights (Part 2)*, 97th Cong. (1981) ...............................................................5

*Extension of the Voting Rights Act: Hearings on H.R. 939, H.R. 2148, H.R. 3247, and H.R. 3501 Before the H. Subcomm. on Civil and Constitutional Rights (Part 1)*, 94th Cong. (1975) .......5

S. Rep. 94-295 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774 .................................................4, 5

S. Rep. 97-417 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177 ...........................................3, 5, 6

Theodore Z. Wyman, *Litigation of Voter Intimidation Law*, 174 Am. Jur. Trials 385 (2022)........7

*Voting Rights Act of 1965: Hearings on S. 1564 Before the S. Comm. on the Judiciary (Part 1)*, 89th Cong. (1965) ..................................................................................................................2, 4

*Voting Rights Act of 1965: Hearings on S. 1564 Before the S. Comm. on the Judiciary (Part 2)*, 89th Cong. (1965) .......................................................................................................................4

Voting Rights Fact Sheet, U.S. DEPARTMENT OF JUSTICE (Sept. 2024), https://www.justice.gov/crt/media/1366636/dl.....................................................................10

## AMICUS CURIAE'S IDENTITY & INTERESTS

*Amicus curiae* Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization that has been working for nearly two decades to advance democracy through law. *Amicus* CLC has litigated several prominent voting rights cases, including as lead counsel in *Gill v. Whitford*, 138 S. Ct. 1916 (2018) (redistricting), *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) (NVRA), *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (VRA), *Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020) (en banc) (felony disenfranchisement law), *Clarke v. Wisconsin Elections Comm'n*, 2023 WI 79, 410 Wis. 2d 1, 998 N.W.2d 370, *reconsideration denied* (Jan. 11, 2024) (redistricting), and *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 2244338 (D. Ariz. May 2, 2024) (Arizona Documentary Proof of Citizenship).

*Amicus* CLC has expertise in voter intimidation claims. CLC, including through its affiliate CLC Action, has submitted *amicus curiae* briefs in numerous voter intimidation and political violence cases. *See, e.g.*, *Andrews v. D'Souza*, No. 1:22-cv-04259-SDG (N.D. Ga. 2023); *Cervini v. Cisneros*, No. 1:21-cv-565 (W.D. Tex. 2022); *LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423 (E.D. Va. 2018); *Cockrum v. Donald J. Trump for President, Inc.*, No. 3:18-cv-00484 (E.D. Va. 2019); *New York Immigr. Coal. v. Rensselaer Cnty. Bd. of Elections*, No. 1:19-cv-920 (N.D.N.Y. 2019); *Blassingame v. Trump*, No. 2:21-cv-858 (D.D.C. 2021); *Lee v. Trump*, No. 1:21-cv-400 (D.D.C. 2021); *Swalwell v. Trump*, No. 1:21-cv-586 (D.D.C. 2021). CLC has a demonstrated interest in the interpretation of voter intimidation laws that protect voters and the proper functioning of democracy.

**INTRODUCTION**

After enforcement of existing legislation failed to root out intimidation and political corruption, Congress enacted Section 11(b) of the Voting Rights Act to finally protect those "who vote[] from personal violence or intimidation, and the election itself from corruption or fraud." *The Ku Klux Cases*, 110 U.S. 651, 661 (1884). Congress purposefully drafted a broad statute to effectuate these aims, which prior statutes – the Civil Rights Act of 1957 and the Ku Klux Klan Act of 1871 – failed to completely remedy. *See Voting Rights Act of 1965: Hearings on S. 1564 Before the S. Comm. on the Judiciary (Part 1)*, 89th Cong. 12 (1965) (statement of Nicolas Katzenbach, United States Attorney General); *see also* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. REV. L. & SOC. CHANGE 173, 190 (2015).  Emerging out of the Civil Rights Movement and in response to the enduring issue of minority disenfranchisement, Section 11(b) was part of a comprehensive package of robust federal protections to change the circumstances on the ground for voters across the country and create equal opportunities for all to participate in our elections. Specifically, Congress was concerned about restrictions on voter assistance achieved via intimidation and threats lodged against civil rights groups by state and private actors, which was viewed as a restriction on voting itself – *i.e.*, the kind of intimidation alleged here. Plaintiff Jolt Initiative helps register Latino voters and encourages those voters to exercise their voting rights in Texas. ECF 2 at 2. Defendant Ken Paxton has served Plaintiff with "request[s] to examine" (RTEs) confidential documents related to Plaintiff's voter registration and advocacy activities. *Id*. at 6. If Plaintiff does not comply with the RTEs, Defendant has threatened to terminate Plaintiff's "registration or certificate of formation." *Id*. Among other claims, Plaintiff has alleged Defendant has intimidated Plaintiff in violation of Section 11(b), which provides broad protections against intimidation, threats, and coercion of voter

assistance organizations, including those who face threats by state actors by use of compelled disclosure.

<strong><u>ARGUMENT</u></strong>

*Amicus* CLC submits this brief to clarify the interpretation and application of Section 11(b) of the VRA. 52 U.S.C. § 10307(b). *Amicus* specifically addresses the scope of coverage provided by Section 11(b), addressing Defendant's misapprehension that "there [isn't] any legal precedent in the Fifth Circuit holding that a lawful investigation by the Attorney General constitutes 'intimidation,' a 'threat,' or 'coercion' in violation of Section 11(b)." To the contrary, Fifth Circuit precedent, as well as the legislative history of Section 11(b), a textual understanding of "intimidation," and the common understanding of term "intimidation," all support Plaintiff's allegations that Defendant's use of the subpoena power can constitute "intimidation" within the meaning of the statute.

**I.      The Legislative History Supports Protections for Voter Assistance from Intimidation under Section 11(b) as Pled by Plaintiff.**

It is axiomatic that the Voting Rights Act of 1965, including Section 11(b), intends to protect organizations from interference by intimidation, coercion, or threat in assisting eligible individuals in registering to vote. 52 U.S.C. § 10307(b) (prohibiting intimidation of "urging or aiding any person" in voter registration). Indeed, Congress explicitly considered the "intimidation and harassment of voters and others" in the pursuit of voting and voter registration as a "troubling" trend which needed to be addressed in order to eliminate voting discrimination writ large. S. Rep. 97-417, at 54 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 233. This includes the form of intimidation that Plaintiff has pled in this case: intimidation by state actors using their subpoena power to seek proprietary information about voter assistance and voter registration organizations.

Congress's intent to protect the rights of voter organizations from intimidation via state interference with voter assistance activities is evident throughout the history of the Voting Rights Act's passage and reauthorization. During the hearings on the original passage of the Act, civil rights organizations testified to the intimidation they faced in undertaking voter registration.[1] Congress surveyed numerous cases brought by the U.S. Department of Justice where abuses of government power against both voters and those registering voters resulted in intimidation suppressing political engagement of Black citizens.[2] In his testimony to Congress, Attorney General Katzenbach noted the number of lawsuits filed by the Department of Justice against state actors attempting to prevent Black voter registration through "physical violence and baseless arrests and prosecutions." *Voting Rights Act of 1965: Hearings on S. 1564 Before the S. Comm. on the Judiciary (Part 1)*, 89th Cong. 12 (1965) (statement of Nicolas Katzenbach, United States Attorney General). He further noted that "fear" wrought by state actors abusing their authority was an "obstacle" that was "sometimes more subtle, certainly more damaging." *Id.* It was that "fear" that gave rise to Section 11(b), written specifically by Katzenbach and members of Congress to improve upon existing voter intimidation laws to ensure that actors would be held accountable for "the natural consequences of their acts." *Id.* at 16.

During the passage of the 1975 amendments to the Act, Congress took an extensive look specifically at the "acts of physical, economic, and political intimidation" of language-minority citizens in Texas and the "economic reprisals against minority political activity" as a "a major deterrent to the political participation of language minorities" in Texas and across the country.  S.

---

[1] *E.g.*, *Voting Rights Act of 1965: Hearings on S. 1564 Before the S. Comm. on the Judiciary (Part 2)*, 89th Cong. 996-97 (1965) (statement of Sidney Zagri, International Brotherhood of Teamsters); *id.* at 1292, 1302, 1307 (1964 Status report of the Civil Rights Division of the Department of Justice documenting instances of voter intimidation against civil rights organizations).
[2] *Id.*; *see also Voting Rights Act of 1965: Hearings on S. 1564 Before the S. Comm. on the Judiciary (Part 1)*, 89th Cong. 12 (1965).

4

Rep. 94-295, at 26 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 792.[3] As Modesto Rodriguez of the La Raza Unida Party testified to Congress at the time, this intimidation included economic reprisals by lending institutions, who refused to finance individuals who were involved in political organizations seeking to register Hispanic and Latino voters in Texas. *See* Ari Berman, *Give Us The Ballot* 106 (2015). And "[w]hen economic intimidation didn't work, the Anglo power structure . . . turned to politics" and abuses of power. *Id*. In Frio County, Texas, for example, the county judge used his subpoena power to target hundreds of Chicano voters "for alleged election irregularities." *Id*. at 106-07. Those subpoenas "had a chilling effect on Chicano political participation," and turnout decreased in the next election. *Id*. at 107. Finally, after testifying about his experience, Mr. Rodriguez was nearly beaten to death by Frio County police officers. *Id*. at 111-12. Mr. Rodriguez's harrowing testimony, and the cruel treatment his testimony incurred, led to the overwhelming reauthorization of the Voting Rights Act, including to maintain the protections under Section 11(b). *See id.*; *Extension of the Voting Rights Act: Hearings on H.R. 939, H.R. 2148, H.R. 3247, and H.R. 3501 Before the H. Subcomm. on Civil and Constitutional Rights (Part 1)*, 94th Cong. 519-28 (1975) (testimony of Modesto Rodriguez).

In passing the 1982 amendments, Congress specifically cited concerns with ongoing intimidation of voters and organizations as necessitating several amendments to the Act. The concerns about voter intimidation via state interference with voter assistance were also top of mind during the 1982 reauthorization. For example, one of the driving forces behind Congress's decision to reauthorize Sections 4 and 5 was "the realization that the abuses which take the form of voting changes . . . range broadly from intimidation and harassment to discouragement of registration and

---

[3] These concerns drove the additional protections under Section 203 of the Voting Rights Act for language minority voters. *See generally* S. Rep. 94-295, at 26 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 792.

voting[.]" S. Rep. 97-417, at 14 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 191. Congress was specifically concerned that "intimidation and harassment of voters or others seeking to exercise rights protected by the Voting Rights Act are especially troubling because of the long-term impact it will have on such persons and their communities." S. Rep. 97-417, at 54 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 223 (discussing amendments to Section 4 of the Voting Rights Act). Likewise, NAACP organizer Maggie Bozeman testified that "[o]ne of the most annoying things black voters face in Pickens County[, Alabama] in trying to register is steady pressure of the law enforcement officers." *Extension of the Voting Rights Act: Hearings Before the H. Subcomm. on Civil and Constitutional Rights (Part 2)*, 97th Cong. 1565 (1981) (law enforcement officials would "snoop" and investigate those conducting voter registration). Specifically, she testified about the resistance to voter registration drives by local officials; "[r]arely have we conducted a voters registration drive in Pickens County which has not met with, some resistance from local officials." *Id.* Ms. Bozeman herself was arrested for attempting to assist registered voters, and her conviction was later thrown out.[4] Her testimony to Congress about the ongoing use of state power to intimidate voter assistors inspired members of Congress to support the reauthorization of the Voting Rights Act. *See generally id.* at 1583-85; Ari Berman, *Give Us The Ballot* 138-40 (2015).

For these reasons, Congress has considered it necessary to protect civil rights groups from intimidation by state authorities, making no substantive changes to the language since its original passage in 1965, and *increasing* such protections in other provisions of the Act.

---

[4] *See Alabama civil rights activist Maggie Bozeman dies*, Tuscaloosa News (Aug. 29, 2004), https://www.tuscaloosanews.com/story/news/2004/08/29/alabama-civil-rights-activist-maggie-bozeman-dies/27873342007/ (last visited Oct. 18, 2024).

II.     **The Text of Section 11(b) Contemplates the Type of Intimidation Alleged by Plaintiff.**

Section 11(b) proscribes "intimidat[ing], threaten[ing], or coerc[ing], or attempt[ing] to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote," 52 U.S.C. § 10307, precisely the intimidating conduct that Plaintiff pleads has been committed by Defendant. In statutory interpretation, words are given "their 'ordinary or natural' meaning." *Leocal v. Ashcroft*, 543 U.S. 1, 8-9 (2004) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)); *see also United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 964 (5th Cir. 2019) ("[W]e look first to the word's ordinary meaning.") (internal quotations omitted). To understand the natural and ordinary meaning of Section 11(b), the court may look to both the dictionary definition of "intimidation" and the interpretation of the word "intimidation" in the context of other civil rights cases. Additionally, precedent and guidance by the Department of Justice make clear that Section 11(b) protects not only voters themselves, but those assisting voters from intimidation. Each of these sources suggest that the facts as alleged in the Plaintiff's Complaint fall squarely within the conduct prohibited by Section 11(b).

In the mid-1960's—when Section 11(b) was written and first enacted—Webster's Dictionary defined the word "intimidate" as "to frighten; to make timid or fearful; to inspire or affect with fear; to deter, as by threats." *See United States v. Harvey*, 250 F. Supp. 219, 236 (E.D. La. 1966) (quoting Webster's Dictionary); *see also* Theodore Z. Wyman, *Litigation of Voter Intimidation Law*, 174 Am. Jur. Trials 385 (2022) (discussing the "expansive" definition of intimidation under Section 11(b)). This definition does not prescribe the *form* by which the intimidation must take place, be it by communication or the otherwise lawful use of the state's subpoena power. Nor does this definition cabin "intimidation" to particular methods—whether physical, psychological, or otherwise. The statute itself similarly makes no mention of cabining

the term to certain methods of intimidation. "Only the written word is the law" and "when the meaning of the statute's terms is plain, [the court's] job is at an end." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653, 674 (2020). Thus, a plain reading of "intimidation" within Section 11(b) proscribes any conduct or communication that makes one timid or fearful to "urg[e] or aid[] any person to vote or attempt to vote," 52 U.S.C. § 10307, and is not limited to communications nor overt displays of physical force and violence, but extends to a range of conduct that would reasonably place an individual in fear.[5] *See, e.g.*, *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.* (*LULAC v. PILF*), No. 1:18-CV-00423, 2018 WL 3848404, at *1-4 (E.D. Va. Aug. 13, 2018) (finding that the publication of a list of individuals' names and personal information in "a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium" was sufficient to show a finding of intimidation).

Courts have similarly held that the term "intimidate" in other civil rights laws is not limited to communications or physical violence. In interpreting the term "intimidate" in the context of Section 131(b) of the Civil Rights Act, 52 U.S.C. § 10101(b), federal courts have found that

---

[5] A district court recently highlighted the multiple ways voter intimidation may materialize: "Examples of threatened 'legal consequences' that a reasonable person, familiar with context, would view as a threat of injury to deter her from voting include: threats that police will use voter information to find and enforce old warrants; a pattern of baseless arrests at a voter registration event; threats of deportation against lawful citizens who are immigrants and their family members; and threats of filing a lawsuit against someone or suspending them without pay. Examples of threatened 'economic harm' that a reasonable person, familiar with context, would view as a threat of injury to deter her from voting include threats of 'adverse economic consequences,' such as: threatening to give personal information to debt collectors to collect outstanding debt; evicting or threatening to evict sharecroppers from their land or otherwise interfering with their sharecropping contracts; inducing local merchants to boycott and refuse to provide necessities to anyone who helps register voters; and prohibiting an insurance broker from accessing land to talk to his clients, and therefore preventing him from carrying out his profession, because of the broker's voter registration efforts. Additionally, publishing names, addresses, and phone numbers of registered voters in a report accusing them of committing various felonies also constitutes threats and intimidation under § 11(b), both because of the 'clear effort to subject the named individuals to public opprobrium' and the 'fear of harassment and interference with their right to vote' that the named individuals experienced." *Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486, at *7 (N.D. Cal. Sept. 3, 2024) (citations omitted).

"threats, intimidation, or coercion may take on [many] forms." *U.S. v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961); *U.S. v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965) (finding that declining to renew a teacher's contract "as a means of coercing or intimidating the teacher as to her right to vote" was sufficient to show intimidation); *People v. Horelick*, 424 F.2d 697, 703 (2d Cir. 1970) (noting that 18 U.S.C. § 245(b) is "[u]nlike the voting rights acts" (including Section 131(b)), in that Section 245(b) requires "force or threat of force."). Likewise, state civil rights law has defined "'Intimidation' [as] putting a person in fear for the purpose of compelling or deterring his or her conduct. . . [and] 'Coercion' [as] application of physical or moral force to another to constrain him to do against his will something he would not otherwise do." *Damon v. Hukowicz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) (finding in an analogous civil rights context that "[i]ntimidation means putting a person in fear for the purpose of compelling or deterring his or conduct").

Another similar use of the term can be found in 42 U.S.C. § 1985(2), which prohibits conspiracies to intimidate parties or witnesses in connection with legal proceedings. In interpreting that section, a district court held that emotional stress, not merely physical injury, could give rise to a claim for witness intimidation under that provision. *Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*, No. 97-cv-0040 (RLE), 1999 WL 893398, at *4 (S.D.N.Y. Oct. 18, 1999). The court explained that though the Civil Rights Act of 1871 was "adopted to address physical intimidation . . . which often resulted from Klan violence," this "was not the only goal of the statute." *Id*. Further, the court found that the statute was "also designed to address improper interference with the judicial process," and therefore the plaintiff could bring a claim alleging that there was interference "with the witness' ability to give 'free, full and truthful testimony' in federal court." *Id*.

Similarly, 42 U.S.C. § 3617 makes it unlawful to "intimidate, threaten, or interfere with" a person for enjoying or exercising fair housing rights. In cases involving this statute, courts have held that plaintiffs stated claims for intimidation regardless of whether defendants' conduct included physical violence. *See, e.g., People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733 (E.D. Va. 1992) (excessive investigations by the city of a rental property can constitute intimidation); *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (recognizing that intimidation can constitute fearful activity aside from a physical confrontation, including sexual harassment, economic pressure, or patterns of harassment).

This textual understanding also supports the Fifth Circuit's straightforward position that Section 11(b) protects "the assisting of others in registering to vote." *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (discussing the legislative text of Section 11(b) to come to this conclusion). As other district courts have recognized, "Section 11(b)'s reach is extensive," and its protections extend "not just [to] voting, but to other voting-related conduct, including . . . encouraging others to vote or helping register other voters." *Nat'l Coal. on Black Civic Participation v. Wohl,* 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020)[6]; *see also Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *8 (M.D.N.C. June 2, 2021). Likewise, the U.S. Department of Justice has instructed that Section 11(b) "protects not only voters, but also those who help them or who facilitate voting or registering to vote, including election officials and volunteers. The prohibitions apply to both private and government actors." VOTING RIGHTS FACT

---

[6] Defendant improperly reads a subsequent *National Coalition* decision to limit "intimidation" to communications which interfere with the right to vote, but neither Section 11(b) nor that decision are so limited. Rather, in applying the specific facts of that case, which involved intimidating Robocall communications, the district court held that Section 11(b) intimidation "include[s] messages that a reasonable recipient, familiar with the context of the communication, would view as a threat of injury to deter individuals from exercising their right to vote.". *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023). Nowhere does that district court claim that Section 11(b) intimidation is limited to such communications.

SHEET, U.S. DEPARTMENT OF JUSTICE (Sept. 2024), https://www.justice.gov/crt/media/1366636/dl.

Thus, the plain text of Section 11(b), precedent applying it and analogous law, and the law's purpose all make clear that Section 11(b) protects any person or organization from intimidation or attempted intimidation for providing voter assistance or voter registration—specifically what Plaintiff alleges in this case.

### III.  The Common Understanding of Intimidation Includes the Conduct Alleged by Plaintiff.

Courts have long understood that the state's subpoena power can run the risk of political harassment or intimidation. This is true even where, as here, the state alleges a legitimate purpose in exercising its authority to compel the disclosure of confidential or proprietary information from civil rights groups.

The Supreme Court most notably recognized the intimidating nature of compelled disclosure in *NAACP v. Patterson.* There, the Supreme Court prevented the State of Alabama from using civil discovery to compel the names and addresses of NAACP members and agents. *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451 (1958). The Court held that even though the "exclusive purpose" of the compelled disclosure was "to determine whether petitioner was conducting intrastate business in violation of the Alabama foreign corporation registration statute," the interest was not "sufficient to justify the deterrent effect" of the compelled disclosures on the NAACP's activities. *Nat'l Ass'n for Advancement of Colored People*, 357 U.S. at 464.

Though *NAACP v. Patterson* regards the freedom of association under the First Amendment, the Court's reasoning is nevertheless instructive in examining how compelled disclosure can constitute voter intimidation under Section 11(b). When considering how the use of

compelled disclosure of proprietary information against civil rights organizations infringes on First Amendment activity, courts generally balance whether "disclosure will adversely affect an organization's ability to pursue collective efforts to foster beliefs and may induce members to withdraw or dissuade others from joining." *Fund Texas Choice v. Deski*, No. 1:22-CV-859-RP, 2024 WL 3223685, at \*5 (W.D. Tex. May 1, 2024) (*citing Nat'l Ass'n for Advancement of Colored People*, 357 U.S. at 462-63) (internal quotation marks omitted). Where, as alleged here, a plaintiff has alleged that the state has used a state action to intimidate an organization assisting with voter registration, precedent makes clear that a claim has been sufficiently pled.

Courts have also recognized that the use of subpoena power or compelled disclosure could give rise to intimidation claims in the context of multiple civil rights laws. The Fifth Circuit, in discussing a Section 1985 case filed against Dallas County, Texas, recognized that ostensibly lawful subpoenas were a "patent sham" where the "evidence is overwhelming that the purpose . . . was not to ascertain violations of state law, but rather to harass and obstruct the operations" of the party being subpoenaed. *United States v. McLeod*, 385 F.2d 734, 751 (5th Cir. 1967) (discussing a claim of voter intimidation which included the use of subpoena power to compel materials from the United States Department of Justice); *see also Freeman & Bass, P.A. v. State of N.J. Comm'n of Investigation*, 359 F. Supp. 1053, 1057 (D.N.J. 1973) (finding a claim of intimidation stated under Section 1985 where a state agency used their administrative subpoena authority against civil rights attorneys to seek information about their clients) (dismissed on other grounds). And where "an investigation" pursuant to administrative subpoena power is "being conducted solely for an improper purpose such as political harassment or intimidation or otherwise in bad faith," it is illegitimate. *Pennington v. Donovan*, 574 F. Supp. 708, 709 (S.D. Tex. 1983)

(regarding the issuance of administrative subpoena under the Employee Retirement Income Security Act).

Plaintiff's allegations regarding the effects of Defendant's use of the subpoena power here align with the Court's understanding in *NAACP v. Patterson* that a state's use of compelled disclosure might chill association and assembly. Courts' recognition that government action, including compelled disclosure or subpoenas, can have the practical effect of discouraging the exercise of an array of political rights contextualizes how such action can constitute voter intimidation under Section 11(b), demonstrating that Plaintiff has stated a colorable Section 11(b) claim. This is true regardless of whether the subpoena power was otherwise "lawful," ECF 19 at 17, because the otherwise lawful use of subpoena power may still lead to the intimidation of voter assistance organizations. *See Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 464 (1958); *cf.* ECF at 19 at 9-11. This is also true regardless of Defendant's assertion that he did not make the subpoena public, s*ee* ECF 19 at 18, as many compelled disclosures, such as the compelled disclosure through discovery in civil litigation, are ostensibly not public. *E.g., Fund Texas Choice*, 2024 WL 3223685, at *5; *Freeman & Bass, P.A.*, 359 F. Supp. at 1057; *Pennington*, 574 F. Supp. at 709.

Cases involving state statutes prohibiting electoral intimidation likewise demonstrate the broad scope of intimidation contemplated by Congress in civil rights law. In *United States v. Nguyen*, the defendant was alleged to have engaged in a campaign to mail 14,000 letters to newly registered voters with Hispanic surnames warning the recipients that if they voted in the election, their personal information would be collected by the government and made available to organizations that were "against immigration." 673 F.3d 1259, 1261 (9th Cir. 2012). That court found that, for purposes of California's state voter intimidation statute, the word "intimidation" is

not "limited to displays or applications of force, but can be achieved through manipulation and suggestion," that is, intimidation may be "subtle, rather than forcefully coercive." *Id*. at 1265.

This understanding is consistent with the Fifth Circuit's holding that Section 11(b) creates a "prohibition of official acts of harassment." *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968). The relevant question, therefore, is not whether Defendant engaged in "a lawful investigation by the Attorney General," as Defendant contends, ECF 19 at 18, but whether that investigation—undertaken under the color of state law—was used to intimidate, threaten, or coerce a person assisting another in voting. 52 U.S.C. § 10307. Indeed, government investigation or compelled disclosure is more likely to be considered unlawful intimidation or coercion when coupled with threats to cease organizational activities, as is present here, where Defendant has threatened to revoke Plaintiff's registration or certification of formation if Plaintiff does not disclose the information requested by Defendant. *See* Bastard Decl., Ex. B; *see also, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. Thompson*, 357 F.2d 831, 839-40 (5th Cir. 1966); *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Flowers*, 377 U.S. 288, 290 (1964). Moreover, when considering whether government investigation or compelled disclosure rises to the level of intimidation, such government actions must be considered "against the background of contemporaneous events in [Texas] and the general climate prevailing there at the time." *McLeod*, 385 F.2d at 740 (finding that a county's government actions led to intimidating and coercive activity against persons registering Black voters).

## **CONCLUSION**

For the above reasons, *Amicus* CLC urges the Court to deny Defendant's motion to dismiss and permit Plaintiff's properly pled Voting Rights Act claim to proceed.

 Dated:  October 18, 2024

Respectfully submitted,

*/s/ Mary Whittle*

Mary Whittle
Texas Bar No. 24033336
Ketan U. Kharod
Texas Bar No. 24027105
**GUERRERO & WHITTLE, PLLC**

510 Baylor Street
Austin, Texas 78703
P (512) 610-2331
F (512) 222-5280
mary@gwjustice.com
ketan@gwjustice.com

Alice Huling* (DC Bar No. 1644296)
Valencia Richardson* (DC Bar No. 1739245)
Rachel Appel* (DC Bar No. 90017750)

**CAMPAIGN LEGAL CENTER**
1101 14th Street, NW, St. 400
Washington, D.C. 20005
Telephone: (202) 736-2200
Facsimile: (202) 736-2222
ahuling@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
rappel@campaignlegalcenter.org

*Counsel for Amicus Curiae*
*Campaign Legal Center*

* Motion for admission *pro hac vice*
forthcoming.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 18, 2024, I served the foregoing upon all counsel of record via the Court's electronic case file (ECF) system.


*/s/ Mary Whittle*
Mary Whittle